# TEXAS COURT OF APPEALS REPORTS.

## GALVESTON TERM, 1890.

| | |
|---|---|
| 28 | 323 |
| 28 | 391 |
| 28 | 599 |
| 29 | 43 |
| 29 | 199 |
| 28 | 323 |
| 30 | 322 |
| 30 | 667 |
| 31 | 181 |
| 31 | 298 |
| 31 | 367 |
| 31 | 468 |
| 31 | 585 |
| 32 | 169 |

| | |
|---|---|
| 28 | 323 |
| 35 | 132 |
| 36 | 301 |
| 39 | 558 |

## ALFRED HUDSON v. THE STATE.

### No. 2775.  Decided January 22.

1. **Practice—Jury Law.**—The rule is statutory that when the special venire is called in a capital case either party may have attachments for absent veniremen, returnable instanter.  And in selecting the jury from the persons summoned, they must be called and passed upon *seriatim* as their names appear upon the list; and a person who has been summoned but is not present may, upon his appearance before the jury is completed, be tried as to his qualifications and impaneled as a juror unless challenged; but no cause shall be unreasonably delayed on account of the absence of such person, even though an attachment be out for him at that time.  What will amount to an unreasonable delay rests in the sound discretion of the trial judge, and his action in the premises will be revised only upon an abuse of that discretion.  Note that in this case these rules were in no wise infringed in the organization of the trial jury.

2. **Same.**—An "objectionable juror" within statutory meaning is one against whom such cause for challenge exists as would likely affect his competency or impartiality in the trial.  Merely that a "juror objectionable to the defendant" was impaneled and sat upon the jury, is not an exception sufficient to raise the question of the juror's status in this court.

3. **Same—Cases Distinguished.**—After the special venire was exhausted in this case, resort was had to the list of twenty-three jurymen drawn by the clerk from the regular jury for the week.  The calling of the names of these jurors disclosed that several of them had been impaneled on the trial of another felony case, and were then in retirement deliberating upon a verdict.  The defense moved for postponement until the said jurors could be brought in and passed upon in the order in which their names appeared upon the list.  The motion was overruled.  Certifying the bill of exceptions to his action in this matter, the trial judge states as follows:  "The call of the remainder of the panel was proceeded with and the jurors passed upon, and the Allcorn jury being unable to agree was discharged, and the jurors were called and passed on in this case before the talesmen were ordered."  *Held*, that the action of the trial court was not error.  Note distinction between this and the cases of Bates v. The State, 19 Texas, 123, and Thurston v. The State, 18 Texas Ct. App., 26.

4. **Same.**—"When a juror is misnamed in the copy of the special venire served on the defendant, it is the proper practice to stand him aside."  Refusal to stand aside a special venireman for this cause, upon the organization of the jury in this case, was error, but the error was immaterial in view of the fact that he was peremptorily challenged by the defense, and that no objectionable juror was impaneled on the trial.

5. **Evidence.**—The defense on the cross-examination of a State's witness proved certain matters relating to the defendant's attempts to prosecute the deceased before the witness, who was a justice of the peace.  The State, in response, was permitted to prove by the said witness, over defendant's objection, that the deceased had previously instituted prosecutions before him against the defendant.  *Held*, that whether or not the evidence was collateral, irrelevant and immaterial, the defendant having caused its introduction, can not be heard to complain.

[323]

6. **Same.**—To contradict a witness the State was permitted to read in evidence the record of the said witness's testimony on the examining trial of the defendant. It was not objected at the time that the impeachment was upon immaterial and collateral matter, nor was the identity of the record as the evidence duly and legally taken on the examining trial questioned. *Held,* that the evidence was properly admitted.

7. **Same—Murder—Motive—Charge of the Court.**—The evidence establishing that the deceased, having accused the defendant and others of murdering his child by poison, was prosecuting the defendant therefor, the State, over defendant's objection, was permitted to read in evidence the indictment against the defendant for the murder of said child. *Held,* that the indictment was properly admitted as evidence competent in connection with the other proof noted to be considered by the jury in determining the motive of the defendant in killing deceased. And motive being a main issue in the case, the court did not err in omitting in its charge to limit and restrict the said evidence to the purpose for which it was admitted—the rule being that restriction or limitation by charge does not obtain with regard to evidence proving directly the main issue involved in the trial.

8. **Practice—Evidence.**—The defense complains of the statement in argument by the district attorney that he could make the case stronger against the defendant if the court would hold the case open until he could produce the testimony of an absent witness. But *held,* that the evidence, independent of the absent testimony, being ample to support the conviction, the said remark could not have injured the defendant, and is not, therefore, cause for reversal.

9. **Charge of the Court—Self-Defense.**—It is objected to the charge on self-defense that it omitted to instruct the jury that the defendant had the right to act upon the appearance of danger, and that it was not necessary that the danger be real; and further, that it omitted to instruct that defendant was not bound to retreat. But *held,* that the testimony of the defendant in his own behalf showing that his danger was real and not apparent, and that he did retreat before he fired the fatal shot, eliminated the questions of apparent danger and retreat as issues in the case.

Appeal from the District Court of Washington. Tried below before Hon. C. C. Garrett.

This conviction was in the first degree for the murder of Ed Brackens, the penalty assessed being a life term in the penitentiary.

W. J. Johnson was the first witness for the State. He submitted a diagram of the country immediately surrounding the place of the killing. See page 325.

The witness testified, in substance, that he lived in the town of Burton, in Washington County. B. C. Anderson, the justice of the peace, requested him on the morning after the homicide to accompany him to the place of the killing and view the body. Witness consented, and at Union Hill, four or five miles from Burton, they got H. M. McBryan to go with them. They reached the place of the killing, seven or eight miles north from Burton, between 9 and 10 o'clock. The body lay on the left hand side of the road leading from Burton, through a narrow lane formed by the fences of defendant and Bishop, and thence past the houses of defendant and deceased. The point where the body lay was just beyond the mouth of the lane towards the deceased's house, and near a small post oak tree which stood near the road. At a point opposite the tree and body the defendant's field fence cornered and "angled off" to the right

and passed the defendant's house at a point about one hundred yards distant from the dead body. Deceased's house was about half a mile north of defendant's house. The defendant's field, pasture, and house were on the right hand side of the Burton road, going from Burton, and the Bishop field, in which the Angelina Gaines house was situated, was on the left hand side of that road. Deceased's body lay ten or fifteen feet beyond the mouth of the lane, and three or four feet from the post oak tree—the only tree in the immediate vicinity. Defendant's field fence—an old fashioned worm fence, eight or ten rails high—was about fifteen steps distant from the body. Witness found blood on some weeds near the body and under the body. He also found a 44-calibre six shooter lying on the ground near the body, the deceased's right hand touching it. As directed by the justice of the peace the witness took up and examined the pistol. He found it to contain five loaded chambers and one empty shell. The empty shell, on which the hammer rested, was cankered, and had evidently been long exploded. It was rusted inside and out, and the cylinder could not be revolved. On the weeds near the defendant's fence corner and on a line with the tree and body the witness found some gun wadding.

On the inside of the defendant's fence, at the corner before referred to, the witness found a broken fence rail, one end of which was thrust into the fence in such manner as to make a comfortable seat. The ground between that broken rail and the fence was bare, and showed distinctly the tracks of a man who had sat or stood there for some time, facing the tree near which the dead body was found. Those tracks led off from that place across the cotton rows, which ran parallel with the fence, to a point a short distance from the said corner, where they intersected a cross row or path which they traversed until they nearly or quite reached the gate of the yard about the defendant's house. At the point where the tracks intersected the turn row the man fell down, as was shown by the prints in the ground of a hand and knee and the butt of a gun. A trail on the outside of defendant's field led from his house to the house of Angelina Gaines, in Bishop's field, which field was across the lane from defendant's field. That path passed the post oak tree at a very short distance. The distance from the said tree to the house of Angelina Gaines was about 250 yards. Witness saw tracks of a horse about seven steps distant from the corner in which the broken rail had been placed. That horse traveled towards the house of the deceased until it reached the point just opposite the corner, when it turned off towards the woods. The track of the horse nearest the body was distant about four or five feet. The witness found no other human or horse tracks than those described.

On cross-examination the witness said that he was the proprietor of a saloon in Burton. He accompanied Anderson to the scene of the homicide by request of Anderson. The body, when witness saw it, lay on the

left side, with the right hand touching the pistol.  Buckshot had pene-
trated the right side in several places.  Defendant's house was enclosed
in a yard, the gate of which was about fourteen steps distant from the
house.  Witness took home with him the pistol found at the body, and
did so by direction of Anderson, the justice of the peace, and not because
deceased owed him, although as matter of fact deceased did owe him.
Witness greased and cleaned the pistol, after which it operated very well.
It was demanded of him about the time of the examining trial and he
delivered it to R. P. Hackworth, the justice of the peace who held the
examining trial.   The witness did not on the 18th day of August, 1888,
see the deceased assault and run the defendant out of the town of Bur-
ton.   He saw them on that day and expected them to have a fight.
When he saw them they were quite a distance apart, deceased with a knife
in his hand and defendant on his mule leaving town.   Witness did not
on that day advise deceased to kill defendant, but some time before did
tell deceased that if he was deceased he would get a gun and kill defend-
ant.   On the day after the defendant's examining trial in Brenham the
witness told Becker that defendant was a " damned son-of-a-bitch who
ought to be in hell, and deceased alive, and that if his, witness's, evi-
dence would send defendant to hell he would go."   Witness did not
know that deceased habitually carried arms, but thought he did.   He
knew as a matter of fact that hostile feelings existed between deceased
and defendant for a long time prior to the homicide.

The testimony of Justice of the Peace Anderson, the next witness for
the State, was substantially the same as that of the witness Johnson, ex-
cept that he had no recollection of seeing gun wadding at the place of
the killing.   It was also his impression that both ends of the broken rail
rested on the fence at the corner, forming a convenient seat and leaving
a triangular space of ground between the rail seat and the fence.   That
space was bare and had been tramped flat.   Witness could not say that
he saw a footprint in that tramped place, but the tracks across the field
led directly from the corner of the fence across the cotton patch to the
turn row, and thence to the defendant's house, and were fresh.   Deceased
and defendant were old enemies at the time of the homicide.

Cross-examined, this witness said that on August 5, 1888, the defend-
ant proposed to file before him as justice of the peace a complaint charg-
ing deceased with assault and battery, alleging that deceased had assaulted
and run him out of the town of Burton.   Witness declined to take the
complaint, and advised that defendant and deceased enter a ring and fight
it out.   Witness heard of deceased running defendant out of the town
with a gun, but had no recollection of defendant proposing to file a com-
plaint for that assault.   If he did witness declined to take it.   Some time
prior to the homicide deceased asked witness if it was unlawful for a person
to carry a gun, and witness told him that it was not.   Witness examined the

defendant's premises on the morning after the homicide, and discovered a place where a bullet had struck and splintered a log in the end of the kitchen next to the house. He could not tell whether the ball had been recently fired into the log or not. He also found bird shot holes in the plank on the gate inside the yard, which did not appear to have been recently made.

Re-examined, the witness said that before the defendant proposed to file complaints against the deceased, the deceased filed several complaints against the defendant, all of which were filed with and taken by witness.

Sherrell Jackson was the next witness for the State. His testimony, so far as it relates to what transpired on the night of the homicide, is much more in detail and circumstantial on cross than on direct examination, and it will, in this regard, be reported from the cross-examination. His evidence otherwise was a substantial corroboration of the previous witnesses. He described the bare spot or space between the rail seat and the fence as an old trodden or beaten place in the ground. On that space he saw the impression of a heel and toe that he thought might have been made the night before. The tracks to the turn row and thence to the house led off from the said fence corner, and there were no tracks going to the corner. No tracks were looked for in the path in Bishop's field.

On his cross-examination he testified that he lived about half a mile distant from the house of the defendant. He heard a gun shot at about 9 o'clock on the fatal night. Between 10 and 11 o'clock, after he had retired, Allen Nunn called at his house and told him that the defendant wanted him at his, defendant's, house. Nunn then left to summon other neighbors. He soon returned to witness's house with Oscar and Milledge Welburne and Jonas Hudson, and the party went to defendant's house. They found the defendant on the gallery, his wife and children being the only other persons on the place. In the presence of the Welburnes, Nunn, and Jonas Hudson, the defendant then told witness that, as he was on his way home that night from the house of his sister, Angelina Gaines, who lived in the Bishop field, and that about the time he passed the post oak tree near the mouth of the lane, somebody called to him to stop; that he fled, and was fired upon by somebody just as he reached the fence; that he jumped the fence and fired back towards the place near the tree, where he thought he saw two persons when he was challenged; that while fleeing towards the fence he thought he saw other persons in the trail on the outside of the fence; that after firing back towards the tree he ran across the cotton patch to the turn row, and up the turn row to his house; that as he passed between the kitchen and shed room some person fired at him from the front yard fence, the bullet, he thought, striking the kitchen; that he then ran through the house, opened the front door, and fired in the direction of the gate; that he thought he saw persons running away from the front gate; that he then reloaded his gun and went

to Allen Nunn's to get him to go for some of the neighbors to stay with him until daylight. He then requested the witness and others to go to the mouth of the lane and about the tree to ascertain if he shot anybody when he fired.

Witness, the Welburnes, and Jonas Hudson went to the lane and to the tree. Finding nothing, witness so notified defendant, who shouted to the party to "bear up a little." When they had gone a short distance in the direction pointed, Jonas Hudson found the deceased's hat, and about fifty feet beyond it the body was found. It lay on the right side, the fingers of the right hand nearly or quite touching a pistol. Witness then cautioned the others not to approach the body in a manner to disturb the ground, and to touch nothing until the coroner came. They then returned to defendant's house and reported to him that he had killed Ed. Brackens. He asked what the deceased had. Witness replied that he had a pistol. Defendant said that he would go to Brenham and surrender to the sheriff. Jonas Hudson and Oscar Welburne then went to the field and caught and saddled the defendant's mule, and defendant left, going in the direction of Brenham. Before he left, defendant, in the presence of the Welburnes and Jonas Hudson, told witness to notify Justice of the Peace Anderson, and to have Anderson look about the tree for tracks; to show Anderson where he jumped the fence, and his tracks across the cotton patch, and to ask him to examine the kitchen wall on the outside for a bullet hole, and the plank on the inside of the gate for shot holes.

The witness and his party remained at defendant's house until the next morning, watching the body, which lay between sixty and a hundred yards distant. No person approached the body on that night, nor before it was reached by Justice of the Peace Anderson and Johnson. Nunn left defendant's before day to go to Burton to notify Anderson. Witness saw no tracks, either of horse or man, about the body before the arrival of Anderson. Anderson, Johnson, and McBryan arrived about 11 o'clock. Witness showed Anderson the tracks in the cotton patch. The nearest of those tracks to the track in the smooth place at the corner was about six feet, and it was in the plowed ground. The track in the smooth place and those across the cotton patch and along the turn row appeared to be the same. Witness told Anderson what defendant said about the killing. Witness went with Anderson and others to examine the defendant's premises. He found a bullet hole in a log projecting from the kitchen wall. Witness thought that bullet hole was recently made. They also found some shot holes in the fence gate on the inside. Some of them looked fresh and others old. The fresh looking ones the witness knew were not in the gate boards during the preceding July. In July the defendant called witness's attention to a bullet hole in the gable end of his gallery, which he said was made by a shot on the night before.

His wife said that she believed Ed. Brackens made it attempting to shoot into the house.   Defendant appeared to agree with her in opinion.

Jasper Guyton testified for the State that he saw one track in the "packed" or bare space between the broken rail and the fence corner. The toe pointed toward the body of deceased.   In appearance it was similar to the tracks that crossed the cotton patch and went up the turn row to defendant's house.   The State closed by introducing in evidence an indictment charging the defendant with the murder by poison of J. D. Brackens, on August 13, 1887.

Milledge Welborne was the defendant's first witness.   He testified substantially as did the witness Jackson for the State, and further, that he lived less than a half a mile from the defendant's house.   He heard four distinct shots at or near the defendant's place, at about 9 o'clock on the fatal night.   The first shot was a feebler report than the second. The first two were fired with a short interval.   Six or seven minutes later two more shots were fired, the interval between them being somewhat longer than between the first two.   The bare space between the broken rail and the fence corner mentioned by preceding witnesses was about the size of the bottom of a common spittoon.   Witness saw two plainly marked brogan shoe tracks in the weeds and grass at the lock (?) of the fence, and near the end of the rail that rested on the ground, and in the same panel of fence with the bare space.   They pointed toward the cotton patch, and corresponded with the tracks in the plowed ground and the turn row.   The bullet hole in the kitchen wall and the shot holes in the gate appeared to witness to have been recently made.   Deceased habitually carried his pistol, and within a year preceding his death he told witness he expected to be the death of defendant.

Allen Nunn testified for the defense substantially as did Jackson for the State, and further, that defendant came to his house—which house was 400 or 500 yards from the defendant's house—about 10 o'clock on the fatal night, waked him, and told him that somebody had fired upon him at the mouth of the lane and at his house, and that he wanted witness to collect seven or eight men to guard his house until daylight.   He then detailed the circumstances of the shooting about as he subsequently detailed them to Jackson.   Witness told him to go home, and that he would collect a party to protect him.   He did so, and on the next morning, after having found the body of deceased, he went to Burton and reported the killing to Justice of the Peace Anderson.   Late in 1887, or early in 1888, defendant sent witness to Brackens with a proposition to settle their differences and become friends.   Deceased rejected the overtures, and declared that he would kill defendant if it took him twenty-five years to do it, if he lived that long, and that he intended to train his children to kill him should he fail.   Witness reported deceased's reply to defendant.   Witness could not say that deceased was a man likely to execute a threat, but he

thought his "ambition" was to carry out a threat.  Deceased carried a gun for more than a year before his death, and defendant for about three or four months before that event.  In his statement about the shooting, defendant said that on his way home from his sister's house he was fired upon by somebody; that he ran, jumped the fence, fired back, and hit somebody; that there was one person at the post oak tree near the trail, two in the road, and two at his house.  He directed that Anderson be told to look for a bullet hole in the house, as he heard a bullet strike it.  Witness saw a fresh bullet hole in a log of the kitchen wall, and fresh bird shot holes in the gate on the inside.

Cross-examined the witness said that about three years before his death the deceased got him to see the defendant about four trees which he claimed that defendant had cut from his land, and, with a proposition to make friends, to make a demand for the payment of $25 for the trees.  Defendant replied to that proposition that deceased could cut any four trees he could find that he wanted on his, defendant's, land, but that he would not pay the $25 demanded; and that if deceased would acknowledge that he had treated him badly in circulating reports about him, that he would make friends and drop the matter; otherwise he wanted nothing to do with deceased.  Deceased refused the counter proposition of defendant.  Afterwards, in 1887, the defendant and deceased met and had a fight.  Subsequent to the fight the witness visited deceased with a proposition from defendant to make friends.  Deceased rejected the overture, declared that defendant had poisoned his child, and that he would take revenge by killing defendant if it took twenty-five years, and that he was going to train his children to kill defendant.  It was the habit of defendant to frequently visit his sister, Angelina Gaines.  Deceased accused other persons as well as defendant of poisoning his family.  Defendant claimed that his house was fired into at night in July, 1888, and declared his belief that deceased did it.

Testifying as did the previous witnesses as to what occurred on the night of the homicide, and as to the tracks, the body, etc., Oscar Welborne further testified for the defense that he saw the pistol when it was taken from the ground near the deceased's body by Johnson, and afterwards at the examining trial, and he knew that pistol to belong to the deceased, having frequently seen it in deceased's possession.  Twice within a short time—a few weeks—before the killing he heard the deceased say that the defendant killed his, deceased's, child, and that he would kill defendant if it took him twenty years in which to do it, and that meanwhile he would teach his son to kill defendant.  Witness heard two shots on the night of the homicide.  They sounded about alike, and tolerably close together.

Richard Harris testified for the defense that he was engaged in cutting poles for Angelina Gaines on the day of the night of the killing.  He

went to Mrs. Gaines's house to supper, arriving about dark. Defendant was then there, and remained there until 9 or 9:30 o'clock, when he left to go home. He had his shot gun with him. A few minutes after he left the witness heard two shots in the direction of defendant's place, one much louder than the other. About six minutes later he heard another shot, and presently a noise or sound that he took to be a shot. He thought the first shot he heard was fired from a pistol. He heard of the killing about 11 o'clock on the next morning, and went to the defendant's house. He then saw a fresh bullet hole in a log of the kitchen wall. The bullet must have been fired from the front of the house. He also saw some shot holes in the planks of the front gate, but did not observe whether or not they were recently made. Recently before the killing, deceased told witness in Burton that he would not hurt witness, but that defendant had poisoned and killed his baby, and that he would kill defendant if it took him twenty years to do it, and that he would attack defendant in Burton, in the bottom, or anywhere else he could find him. The witness knew the pistol found at the body of deceased. It belonged to deceased.

Mrs. Angelina Gaines, the sister of defendant, testified in his behalf that she sent her daughter Julia to the defendant's house on the evening of the killing to get defendant to come to her house and doctor a cow for worms. Defendant came back with Julia, doctored the cow, and remained until about 9 or 9:30 o'clock. Harris was at witness's house when defendant left. A short time after the defendant left the witness heard four shots fired in the direction of defendant's place. The first and third shots were not so loud as the second and fourth. Witness was the wife of Bill Gaines, who left the place during the fall preceding the death of the deceased, and had never returned.

Julia Gaines testified for the defense that her mother sent her after the defendant on the evening of the fatal day. Defendant returned with her, and was at her mother's house when the witness went to sleep immediately after supper.

Mary Hudson, the wife of the defendant, testified in his behalf that, responding to a message brought by Julia Gaines, the defendant left home a short while before sundown on the fatal day, to go to the house of Angelina Gaines to doctor a cow. He took with him the shot gun which, in consequence of threats against his life by the deceased, he had carried constantly for three or four weeks. Between 9 and 10 o'clock on that night the witness heard two shots fired a short distance from her house. A few minutes afterwards a third shot was fired at the front yard gate. Almost immediately the defendant entered the house through the shed room, passed hurriedly to the front door, threw it open and shot towards the gate, and witness heard the sound of what she took to be the flight of two or three persons. Defendant immediately reloaded his gun and went off to summon some of his neighbors for protection.

He soon returned, and between 11 and 12 o'clock Allen Nunn, Sherrell Jackson, Jonas Hudson, and Oscar and Milledge Welborne came to the house.   They got two lamps, and after a short search found the body. Defendant, upon the discovery of the body, left for Brenham and surrendered.   On the next morning the witness saw a freshly made bullet hole in one of the logs in the kitchen wall, and fresh shot holes in the planks of the front gate.   Witness heard different parties, at different times prior to the killing of deceased, tell her husband that deceased had declared his intention to kill him on sight.   A shot was fired into the defendant's house one Saturday night in the preceding July, after the witness and defendant had retired.   The ball plowed up the floor, but was not found by witness.   Defendant told witness, after he fired out through the front door, that somebody shot at him from or near the post oak tree; that he fled, and as he jumped the fence he fired back and saw something fall; that he saw two other persons in the road whose purpose appeared to be to cut him off from the house; that as he entered the shed room he was fired upon by somebody at the front gate, and that when he fired from the front door he fired at somebody at the gate.   The witness heard but two shots before those fired at the house.

Charles Cheeks testified for the defense that late on the fatal evening he saw the deceased at the house of Peter Bostick, about two and a half miles from defendant's house.   He came to Bostick's on horseback, with a jug tied behind the saddle, which he brought to fill with molasses.   He had a pistol in his saddle pockets.   Witness took it out and "pranked" with it, but did not revolve nor try to revolve it, but he knew that the cylinder contained at least five cartridges.   Deceased said that the pistol was his and that it had six balls in it.   The pistol was a black handled weapon, similar in appearance to that exhibited on the examining trial. It was not rusty.   Witness said to deceased, "This looks bad.   You a preacher, Hudson a deacon, and both of you members of the Baptist Church.   You ought to make peace."   He replied that defendant killed his child; that he and defendant could not live in the same community, and that he would kill defendant if he lived.   Defendant once told the witness that deceased had sworn to kill him on sight, but that he, defendant, was anxious to make friends.   Witness believed the deceased to be a man who had the nerve to execute a threat.   Deceased left Bostick's about dusk, riding off in a gallop towards his home.

Peter Bostick testified for the defense that the deceased came to his house on the evening of the fatal day to get a jug of molasses, but witness had none.   He left after dark.   Cheeks came to the house while deceased was there and took a pistol from deceased's saddle bags, about which he proceeded to joke deceased.   Deceased said nothing about the pistol containing six balls.   Cheeks remarked that it was a bad thing for deceased and defendant to be at "outs."   Deceased replied, "They have

killed my child, and I will die for it, but I will do it." He made no other threat.

The defendant testified in his own behalf as follows: "On the evening of the killing I had been up to my sister's (Angelina Gaines's) to doctor a cow. She sent her daughter Julia after me. I went about a half hour by sun. We doctored the cow down in her pasture, and came back to the house. Dick Harris came to the house about dark. I stayed there a good while after Harris came. Between 9 and 10 o'clock I started home. I followed the trail through the field, got over the fence near the mouth of the lane, and started along the trail to my house. The post oak tree stood about four or five steps from the trail. .Somebody from near the post oak tree hailed me. It was dark and I could not see who it was. I ran, and as I ran somebody shot. I saw two men at the post oak tree, and two more ahead at the live oak near the gate. Some one hailed and said, 'Stop, there!' I ran, and as I was fixing to cross the road down to the live oak tree I was fired at. I shot back at the person who fired before I jumped the fence. I then jumped the fence, ran across the cotton to the turn row, and down the turn row to the house. Just as I got to the corner of the kitchen, somebody from the front gate shot. I heard the bullet strike the house. I ran into the house, on through the room, and pulled open the front door and fired out at it. I fired at the person who shot at me. I thought I heard two persons running down the road. I then loaded my gun, put on my coat and shot sack, and went to Allen Nunn's. I went pretty swift. I got him to get a crowd and come. He asked me where the person was that shot at me, and I said at the little post oak tree. He said, 'We came by there and did not see anybody.' When the crowd came, old man Sherrell Jackson asked for a lamp to look and see if I had hit anybody. He asked me how I knew I had hit anybody. I said that I heard a grunt or something when I shot. They looked and found the body. They said it was Ed. Brackens. I said, 'Are you sure?' and they said, 'Yes.' I then said, 'Well, I know it's Ed. Brackens now, and I will go to Brenham and surrender.' I told them how it occurred, and left word for Mr. Anderson to look for tracks, and bullet and shot marks. I told them to look at the front gate next morning and see if there was anybody there, and if not, to look for shot. All of the persons, the two at the live oak tree and the two up at the post oak tree, were on foot. The barrel of my gun with which Brackens was killed was loaded with fifteen buck shot, the other barrel was loaded with turkey shot. I carried my gun on account of threats made by Brackens against my life. I came to Brenham and surrendered to the sheriff, and made the same statement to him that I made to the others about how the killing occurred. I did not place the rail in the fence, or make the trampled place at the rail. I did not lie in wait for and shoot

the deceased. I had picked and ginned two bales of cotton out of the cotton next to the fence before the killing."

Cross-examined: "It was about two and a half or three hours after sundown when I started home from my sister's. I came within four or five steps of the post oak tree. It was very dark. Somebody told me to 'Stop there!' I did not know the voice. I had known Brackens a long time; we were neighbors. I don't know whether the voice sounded like any one that I knew or not. As quick as I started to run the person shot. I saw the blaze of whatever weapon was fired. I don't know where I was looking, but I saw the light. I don't know whether I had run or was fixing to run. I think my side was to them. There were others down the trail ahead of me. I was getting away when I was hailed from the post oak tree, and started to go home. When the persons ahead hailed me, they were off to the left of me. When the shot was fired I looked and thought I saw two persons at the post oak tree. I thought it was a pistol shot, as it was not so loud. I think the persons were standing up. They were three or four feet apart. I couldn't tell whether they were white or black men. The live oak tree is in front of the gate, forty or fifty steps from it. I was eight or ten steps from the live oak tree when I turned to jump the fence. I believe I did tell Sherrell Jackson and others that I shot after I jumped the fence. I said in direct examination that I shot before I jumped, but I shot after I jumped the fence. I had my side to the person when I shot. I stopped in order to shoot, and after I shot I broke and ran again. I fell down in the cotton patch. I was running pretty swift. I was over the fence and the person still by the tree when I shot. I shot over the fence and not through it. It is five or six steps from the fence to the tree. I was pretty close to the fence, going across the road, when I was fired at. I didn't know anything about the rail. I had piled cotton there in the corner, but don't (know) whether I jumped the fence at the corner or not. The men were moving up on me and both were running after me when I shot, and the two from the other direction were coming towards me also. I shot in the direction from which I was fired at. It was dark and I couldn't see. I could see a dark bulk like somebody coming towards me. One barrel of my gun was loaded with good sized shot. I don't know what; I just know (they were) good sized shot. It was mighty little hunting I did. I might know buck shot; I had fifteen of them in one barrel of my gun. There was small shot in the other barrel. I couldn't see the man at the gate when I fired there. It is about eight or ten steps from my house to the front gate. The man seemed right at the gate; I could tell from the noise. As I was coming in the field gate somebody shot from the front gate. I came in between the house and the kitchen. I just opened the front door enough to shoot, and saw two persons. It looked dark. I may have seen something white there, but I don't know. I don't know the size of my gun—the size of the

bore—nor how long it is. I used paper for wadding. I always kept one barrel loaded with large shot. I didn't hunt much. I told them to tell Mr. Anderson about the tracks."

Re-examined: "I got to Brenham about daylight. I went to Major Bassett and made the same statement to him that I made to Jackson and others. I was put in jail and stayed there twenty-two days. I have been out on bond ever since."

The defense closed by putting in evidence indictments Nos. 3350, 3352, 3353, and 3354, charging respectively Wes Hudson, Jonas Hudson, Willie Wilson, and Bill Gaines with the murder by poison of J. D. Brackens, being the same offense charged against defendant in indictment No. 3351, introduced in evidence by the State.

H. M. McBryan was the first witness called by the State in rebuttal. He circumstantially coroborated the testimony of W. J. Johnson, declaring positively that there were distinct footprints in the tramped place between the broken rail and the fence corner which pointed towards the body, and indicated that a person had sat or stood at that place for some time. The witness also discovered a man's track leading from the defendant's side gate inside of the field to the corner of the fence and the broken rail. That track was the same as the track leading across the cotton patch, and appeared to have been made at the same time. The pistol taken from the ground near the body of deceased was in bad condition, the cartridges being rusty. The cylinder would not revolve. The empty shell had been discharged several days at least, and the hammer rested on it. The pieces of wadding were found outside of the fence on a line from the corner and the body, one piece about six feet from the corner, and the other in the road. The bullet hole in the log of the kitchen wall was fresh, but the shot holes in the gate were old.

The State read in evidence the subpœna for the deceased as a witness in cause No. 3351, The State v. Alfred Hudson, this defendant, for the murder of J. D. Brackens; the sheriff's return on the same, "executed," and judgments of the court dismissing all of the indictments for the murder of J. D. Brackens for want of evidence, all of which judgments of dismissal were entered subsequent to the death of the deceased.

Henry Hickey testified in rebuttal that he lived about 200 yards distant from the house of defendant. He heard two, and only two, shots fired on the night of the homicide. They sounded alike. Mrs. Hickey corroborated her husband.

August Koch testified for the State that he was an expert in the use of fire-arms, and knew that it would require three or four weeks of time for a cartridge shell, after explosion, to canker or rust inside.

*Bassett & Muse* filed an able brief and argument for the appellant.

*W. L. Davidson,* Assistant Attorney-General, for the State.

WHITE, PRESIDING JUDGE.—Several bills of exception appear of record saved to the rulings of the court with reference to the impaneling of a jury for the trial of the case.

Sixty names had been ordered drawn, selected, and the parties summoned as special veniremen. When the case was called for trial on the 27th of September, the State announced ready for trial, and defendant asked and was granted time to prepare his application for a continuance. Another case, viz., The State v. Allcorn, charged with a felony, was called, and its trial proceeded with to fill up the interim. The jury impaneled in the Allcorn case were selected from the list of jurors who had been regularly drawn and selected for that week of the term. As soon as the Allcorn case had been submitted to the jury, and they had retired to consider of their verdict, appellant's case was again called, and his application for continuance having been overruled, the trial was ordered to be proceeded with. Of the special venire which had been summoned, it was ascertained when their names were called that five of the said veniremen were absent. Defendant immediately demanded an attachment for each of said absentees, and asked a postponement of the trial until the service and return of said process. This request was granted in so far as the issuance of the attachments was concerned, but the court refused to postpone the trial, and the remaining names upon said special venire were ordered to be called and passed upon until the same was exhausted. Meantime two of the five absentees were brought in under the attachments issued, and they were also passed upon. When the special venire was exhausted the defendant again moved the court to postpone the trial until the other three absentees who had been summoned upon said venire could be attached and brought in under the process which he had sued out for them, or until the said process had been returned, the sheriff stating that said attachments had not been executed for want of time. This motion was refused by the court, and the court directed the call of the regular jury for the week, consisting of twenty-three names, the same having been regularly drawn by the clerk and a list thereof furnished the defendant, and ordered the further completion of the jury to be made from said list, which was done, over objections of defendant. This was the proper practice. Cahn v. The State, 27 Texas Ct. App., 709.

When a special venire, after being summoned, is called in the trial of a capital case, and any person or persons who shall have been summoned fail to appear and answer to his or their names, either party may have attachments issued for such absentee or absentees to have him or them brought forthwith before the court. Code Crim. Proc., art. 618. If the attachment is not demanded for the absentee at this time, the party will

be deemed to have waived his right to the same, and can not be heard afterwards to complain.

Again, it is provided that, "in selecting the jury from the persons summoned, the names of such persons shall be called in the order in' which they appear upon the list furnished the defendant, and each juror shall be tried and passed upon separately, and a person who has been summoned but is not present may, upon his appearance before the jury is completed, be tried as to his qualifications and impaneled as a juror, unless challenged; but no cause shall be unreasonably delayed on account of the absence of such person." Code Crim. Proc., art. 640; Willson's Crim. Stats., sec. 2287; Cahn v. The State, 27 Texas Ct. App., 709.

Under this statute before the jury is complete any of the persons summoned who were absent when the venire was first called, whether they appear with or without having been brought under attachment, may be tried and passed upon as jurors. But in no case is the trial to be unreasonably delayed on account of the absence of any of the persons summoned on said special venire; "and though," as was said in Thuston v. The State, 18 Texas Court of Appeals, 26, "an attachment might be out for some of the original veniremen, that should not unreasonably delay the completion of the jury out of new talesmen summoned."

In this case the defendant had availed himself of his right to attachments for the absentees at the proper time, and he was entitled to assert his right to have them in court to be passed upon, provided it would not cause unreasonable delay in the trial. Now, what are the facts on the question of the reasonableness of the delay? At 2 o'clock on the 27th the attachments were ordered issued and placed in the hands of an officer for service. On the morning of the 28th the sheriff reported that the officer having the process had not had time to execute the process, and the court ordered the completion of the jury out of the names drawn by the clerk from the lists of jurymen of the term, and the jury was completed by noon, the absentees not having been brought in. So it appears that some eighteen or twenty hours elapsed between the issuance of the attachments and the completion of the jury. It was a matter within the discretion of the court to determine the reasonableness of the delay. Do the facts show that the court abused its discretion, or that defendant has suffered injury on account of the court's action? We do not think the facts show an abuse of discretion. It is true that defendant says he exhausted his peremptory challenges in the selection of the jury, and that an objectionable juror was put upon him and, notwithstanding his challenge, sat upon his trial. He does not show wherein said juror was objectionable or the reasons of his objection to him, nor that he was not a fair and impartial juror. An "objectionable" juror, in the sense in which the term is used in this connection, means one against whom such cause for challenge exists as would likely affect his competency or his imparti-

.ality in the trial. Without some such showing it is idle simply to say that . a juror is objectionable. Having exhausted his peremptory challenges he was not under the circumstances here presented entitled to exercise a further challenge of this character. Loggins v. The State, 12 Texas Ct. App., 65.

After the special venire was exhausted and resort was had to the list of the twenty-three jurymen drawn by the clerk from the regular jury for the week, it was found, when their names were reached, that several of these jurymen were upon the Allcorn jury and were considering of their verdict in that case. Defendant moved for a delay and postponement until said jurors could be brought in and passed upon in the order in which their names appeared upon the list, which motion the court refused, and defendant saved his exception. In certifying this bill of exceptions the learned trial judge says: "The call of the remainder of the panel was proceeded with and the jurors passed upon, and the Allcorn jury being unable to agree was discharged, and the jurors were called and passed on in this case before talesmen were ordered." There is no substantial merit in the bill of exceptions reserved to this ruling. The point here made is not analogous to the questions as made in Bates v. The State, 19 Texas, 123, and Thuston v. State, 18 Texas Court of Appeals, 26. These jurors were not summoned upon the special venire in this case at the time they were impaneled in Allcorn's case, and besides this, appellant did in fact have the privilege of passing upon them as jurors after they had been selected and summoned in this case. We can not see that he has any ground of complaint in the matter.

Another exception of defendant growing out of the organization of the jury arose from the following facts: The fifty-third name summoned on the special venire, as shown by the sheriff's return thereon and by the copy served upon the defendant, was C. F. Sanders. In response to the call of this name one C. F. Sander appeared and answered as the party who had actually been summoned. Defendant moved the court to stand said Sander aside for variance in the names, which motion was overruled, and defendant, over his objections, was compelled to exhaust a peremptory challenge upon said juror. "When a juror is misnamed in the copy of the special venire served on the defendant, it is the proper practice to stand him aside." Thompson v. The State, 19 Texas Ct. App., 594; . Swofford v. The State, 3 Texas Ct. App., 77; Bowen v. The State, 3 Texas Ct. App., 617; 72 Ala., 164. It was error to refuse to stand the juror aside, but the error becomes harmless in view of the fact that the juror did not sit upon the case, the defendant having rid himself of him by a peremptory challenge, and no objectionable juror having set upon the case.

The defendant assigns as error the admission of evidence over his objection, and the improper remarks of the district attorney made in the

presence and hearing of the jury, as shown by his several bills of exception relating thereto, as follows:

1.   In admitting the testimony of B. C. Anderson, justice of the peace, as to complaints made by the deceased against the defendant; and in admitting the alleged examining trial record in impeachment of the witness Mary Hudson.

2.   In admitting in evidence the indictment in cause No. 3351, The State of Texas v. Alfred Hudson, charged with the murder of J. D. Brackens by poison, and a subpœna for Ed. Brackens as a witness therein.

3.   In permitting the district attorney to state in the presence and hearing of the jury that he could strengthen the State's case by the testimony of an absent witness; to argue to the jury in his closing speech his belief in the defendant's guilt, and that he was also guilty of poisoning J. D. Brackens, a child of the deceased, as charged in said indictment in cause No. 3351.

4.   Even if said evidence should be held admissible, still the court erred in failing to instruct the jury as to the only purposes for which the same could be considered by them, viz., in determining the credibility of the witness, and as a circumstance tending to show motive in the defendant for the homicide; and in failing to instruct the jury to disregard the improper remarks of the district attorney.

Defendant himself, on cross-examination of Anderson, the justice of the peace, drew out from the said witness matters relating to the defendant's attempts to prosecute deceased before said justice, and in response the State was permitted to prove by said witness that deceased had previously instituted prosecutions before him against defendant.   Even if said evidence was collateral, irrelevant, and immaterial, the defendant should not be heard to complain, he having provoked or caused its introduction.

Nor did the court err in permitting the prosecution to impeach the wife of defendant by reading her contradictory statements made at the examining trial.   It was not objected that the impeachment was upon immaterial and collateral matters, nor that the papers in the examining trial and the signature of the witness had not been proved.   There appears to have been no question made at the time as to the fact that the paper read from was the evidence duly and legally taken at the examining trial.

It was not error to permit the State to read in evidence the indictment against this defendant charging him with having murdered by poison one J. D. Brackens, the child of deceased, and which indictment was pending.   This indictment, together with the fact, otherwise proved, that deceased had accused defendant and others of poisoning his child, and that he was prosecuting him for it, were circumstances tending to establish, and were legitimate for the jury to consider in determining defendant's

motive in killing deceased.  Kunde v. The State, 22 Texas Ct. App., 65, and authorities cited.  This evidence did not prove or tend to prove an extraneous crime.  Such evidence being legitimate and admissible to prove a main issue in the case, to-wit, defendant's motive and malice in the perpetration of the murder, it was not obligatory upon the court in its charge to limit and restrict the purposes for which the evidence was admitted.  The rule as to restriction or limitation does not obtain with regard to evidence proving directly the main issue involved in the trial.  Davidson v. The State, 22 Texas Ct. App., 373.

It is not shown that defendant was in any manner injured or prejudiced by the remark of the district attorney made in the presence and hearing of the jury, and which is complained of by the defendant.  If the evidence is amply sufficient to sustain the verdict and judgment (which is the case in our opinion) without the testimony of the absent witness Carr, whose testimony the district attorney said would make the case stronger if the court would hold the case open until he could produce it, we can not possibly see how such a remark could in any manner prove injurious.

Quite a number of objections are urged to the charge of the court as given to the jury, and exceptions were reserved to the refusal of the court to give the several special instructions requested for defendant.  We are of opinion that none of these exceptions are maintainable.

Upon self-defense it is objected that the charge did not instruct the jury that the defendant had the right to act upon the appearances of danger, and that it was not necessary that the danger should be real.  It is also objected that the court wholly omitted to instruct the jury that the defendant was not bound to retreat.  The defendant testified in his own behalf.  He testified that he was shot at and that he retreated; that he fired as he retreated, and that if he killed deceased, he killed him under these circumstances.  According to this statement of defendant his danger was not apparent but real danger, and appearances of danger was not an issue in the case.  He also testifies that he did retreat.  If this was his own tale as to the matter, how could he be injured by the omission to instruct the jury that he was not bound to do what he did do to save himself?  If he had not retreated, then he might reasonably have claimed that the jury should have been instructed that he was not bound, under our law, to retreat before he could justify a killing on the ground of self-defense against an unlawful attack upon his person likely to produce death or serious bodily injury.  Whether he retreated or not was not an issue in the case as made by his own testimony, and there were no other eye-witnesses to the homicide who testified on the trial.

We are of opinion the charge presented sufficiently the law applicable to the legitmate issues in the case, and that the court did not err in refusing defendant's special requested instructions.

We have found no reversible error in the record of this case as it is presented to us on this appeal, and the judgment is therefore in all things affirmed.

*Affirmed.*

Hurt, J., absent.