**James Duke CREEL, Appellant,**

v.

**The STATE of Texas, Appellee.**

**No. 46035.**

Court of Criminal Appeals of Texas.

April 18, 1973.

Rehearing Denied May 16, 1973.

Jim M. Cross and James E. Robinson, Abilene, for appellant.

Emory Walton, Dist. Atty., Eastland, Ed Paynter, Dist. Atty., and Lynn Ingalsbe, Asst. Dist. Atty., Abilene, Jim D. Vollers, State's Atty., and Robert A. Huttash, Asst. State's Atty., Austin, for the State.

## OPINION

JACKSON, Commissioner.

Appellant was convicted on a plea of not guilty of murder with malice by a jury; the punishment, life.

The indictment charged in proper form the murder with malice by appellant, on March 15, 1971, of Tona Worthington in Taylor County. The trial was held in Eastland County on change of venue on October 11 to 26, 1971.

By his last ground of error appellant challenges the sufficiency of the evidence. The record contains 2002 pages. The evidence was circumstantial. The court charged on circumstantial evidence and on alibi. The defendant testified and denied the offense and sought to explain away the incriminating circumstances. He and his one other witness raised the issue of alibi.

Tona Worthington, a ten year old girl, disappeared from the Reagan Elementary School in Abilene after school on March 15, 1971. On the next day, about 3:00 P. M., her body was found stuffed in a culvert in the north part of Taylor County. She had been raped and strangled to death.

It is necessary to demonstrate the sufficiency of the evidence, which we now do by setting out the salient facts shown on the trial.

Creel customarily drove a red Volvo sedan covered with decals or flowers, and when seen always had his German Shepherd dog with him. The Volvo was registered in the name of Creel and his wife; the license plate number for 1970 being DGV 307 and for 1971 it was DLB 67.

Mrs. Bob Harris testified that she saw Creel near the Reagan Elementary School

on two occasions on March 15, 1971, in the red Volvo, with his dog. About 4:30 she saw him talking to Elizabeth Tomas and Cindy Mann, two pupils about Tona's age.

These two girls testified to seeing Creel on March 15, 1971, the day Tona disappeared, near the Reagan school, and he asked them questions about Tona, how old she was, how she dressed, where she lived. The school coach told about Tona having left to go home about 4:15 P.M. on the fatal day.

Charlotte Harris, a friend of Tona's, told about playing ball with her about 4:15, during which Tona gave her some bubble gum, and when she reached in the sack Tona had three "Snicker" bars. Tona walked west on Hartford Street toward her home.

Dorothy Faye Johnston testified she saw a small, red foreign automobile just east of the Reagan School on the afternoon of Tona's disappearance, with what appeared to be two people in it, which pulled up close to a young girl who was walking away from it. The witness stopped and the automobile drove away.

Ida Belle Coffee, a neighbor, said she saw Tona about half way between the school and her home on March 15, about 4:35 P.M.

J. C. Hinojosa, a sergeant at Dyess Air Force Base near Abilene, said he left the base for home about 5:00 P.M. on the 15th; that as he proceeded down the street near the Elm Creek bridge, across the same creek that runs between the Reagan School and the Worthington home and just north of the school, he observed a small, red foreign automobile parked facing north on a small dirt road which leads from a wooded area; that the automobile, to the best of his memory, was a Volvo; that the car was driven by a Caucasian male, and in the middle of the front seat he saw the head of a female child with her head bent slightly forward. The car then drove away at a high rate of speed. Hinojosa,

being an artist, did a water color painting of what he saw, which was admitted in evidence as State's Exhibit No. 58.

Oscar Villalobos, Pedro Rocha and Bonifatio Valdez testified in substance that on Monday, March 15, 1971, they were on the Old Anson Road in the north part of Taylor County between 5:30 and 6:30 P.M. and saw a red foreign automobile being driven in an easterly direction, a white male driving with a dog on the passenger side. The driver had light hair and dark framed glasses, and the dog was a German Shepherd. The red car followed that of these witnesses and then they lost sight of it where another road intersected the road upon which they were traveling. This location was described by other witnesses as being about 1½ miles from the spot where Tona Worthington's body was found the next day.

Leonard Jefferson testified that on the same day, at about 6:15 P.M., he was driving with his wife and children on the Old Anson Road and a small, red foreign car, being driven by the appellant, whom he identified at the trial, passed him from the rear. He later came upon that same car parked and appellant had the hood of his car and the trunk lid raised. This location is just to the east of the spot, less than one mile, where the body of Tona Worthington was found the next day. Jefferson's wife corroborated his testimony.

Betty Ann Barnes, daughter of Jefferson and wife, testified that she was with her parents on this occasion; that she saw a German Shepherd dog in the car; that appellant was the man looking under the hood of the car, and that there was a girl's coat with big pockets and buttons on the front seat of the little red car, the door being open. She identified the coat of Tona Worthington which was admitted as State's Exhibit No. 63 as the coat she saw in appellant's car. This coat was found in the culvert where Tona Worthington's body was found, and was identified by her mother as being the coat Tona was wear-

ing when she disappeared on March 15, 1971.

There was testimony from the mother of Tona about her disappearance and their frantic search for her, and how on a previous day Creel's small red car had pulled into her driveway where Tona and her two sisters were playing, and how the car sped away when she went out.

Appellant denied to Sergeant Sanders, of the Abilene Police, that he had ever talked to Tona, but admitted talking to two small girls near the school. He also denied to Bill Davis that he had ever seen Tona, and when confronted by Elizabeth Tomas in Davis' presence, denied talking to her about Tona.

Leonard Dodgen of the Abilene Police testified as to the red Volvo automobile used by appellant, covered with decals or flowers; that he flashed his light into this car about 2:30 or 3:00 A.M. on the 16th of March and saw extremely fresh blood on the back seat and a bedspread there. He was present at the culvert where the body of Tona was found stuffed in a culvert, with a bundle of baling wire stuffed in the end of the culvert. He recovered a large quantity of animal hair and "haygrazer," a feeding substance, on the clothing and hair of the deceased child, and clothing worn by her, including the coat previously mentioned. The underside of appellant's vehicle was found to contain "haygrazer."

Dr. B. B. Trotter, a medical doctor and pathologist, performed the autopsy and attributed Tona's death to strangulation, but could not determine the type of instrument used. He described other injuries which caused a great deal of bleeding, but were not contributory to her death. He said the female parts of the child had been penetrated, and that vaginal smears' and the tests thereof indicated that a male who had had a vasectomy had engaged in sexual intercourse with the child. He found partially digested food in the gastrointestinal tract, particularly corn and one peanut. Peanuts were shown to be a main ingredi-

ent of "Snicker" bars. State's Exhibit No. 126 was popcorn found in appellants' red Volvo. Dr. Trotter sent samples of the vaginal swabs to Dr. Ruth Guy, a member of the staff of Southwestern Medical School in Dallas, for testing.

Dr. Guy, who qualified as an expert, testified that she could determine the blood type of a person from vaginal smears, and that if the evidence showed the person from whom the swabs were taken was type "O" blood, then a person with type "A" blood had intercourse with her. The record shows that Tona Worthington was type "O" and appellant is type "A".

Col. Billy Gant, M.D., of the Dyess Air Force Base, testified that the medical records of appellant, who was a soldier there, showed that he had a vasectomy performed in 1964; that he was blood type "A"; and that a person upon whom a vasectomy had been performed could engage in sexual intercourse and would emit seminal fluids but would not emit sperm.

After Lt. W. T. (Bill) Davis, of the Abilene Police Department, was at the location where Tona's body was found on March 16, 1971, then he went to the Live Oak Trailer Park near Dyess Air Force Base, arriving about 5:10 P.M., and observed appellant drive up in a red Volvo sedan with flower and circle decals all over it. A photograph of the car was State's Exhibit No. 1, which showed the flower and circle decals. Lt. Davis then impounded the vehicle.

After a hearing in the absence of the jury, the court overruled objections and admitted in evidence items removed from the vehicle, photographs of the car and of appellant. Many other exhibits, numbering to a total of 135, were admitted in the record.

It was shown that Tona Worthington's coat had type "O" blood on it; that the bedspread taken from the rear seat of appellant's red Volvo had human blood on it which did not respond to testing proce-

dures; that type "O" human blood was on the coat and blouse worn by Tona; that type "O" human blood was on the trunk lid of appellant's Volvo and on his blue tool box found in the trunk of the car; that there were type "O" human blood stains on the floor mat from the rear seat area of the Volvo; and that the trunk mat of that car was missing and the floor was sticky and clean as though the mat had been recently removed.

Dog hair was found on the bedspread, on Tona's coat, skirt and blouse, and it was shown by the analysis of a competent expert to be similar in color and structurally identical to hair from appellant's German Shepherd dog which he had in the car with him, and dissimilar to the hair of the Worthington dog.

Handcuffs and a piece of a bicycle tire were also found in the Volvo automobile and were admitted.

Several girls and one eleven year old boy, some of whom positively identified appellant and all of whom described him and said he was driving a small, red foreign car covered with decals and flowers and had a German Shepherd dog, testified to efforts on his part to entice them into his car; to his saying to them, "Hey, Baby," and following them near nightfall. Some of them got his car number, which was the same shown to belong to the red Volvo registered to appellant.

We are not able within a reasonable compass to detail the entire evidence, but after reviewing the same hold it to be sufficient.

The first ground of error urged by appellant is that the search of the Volvo automobile belonging to appellant and the fruits thereof were in violation of his rights under the Fourth Amendment to the Constitution of the United States and Article I, Section 9, of the Constitution of Texas, Vernon's Ann.St.

In response to objections, the court held a hearing out of the presence of the jury. Lt. W. T. (Bill) Davis, of the Abilene Police Department, testified that about 5:10 P.M., after the body of the dead girl had been found, he went to the home of appellant just as he drove up in his Volvo, arrested him without warrant or search warrant, and searched the automobile, which resulted in the recovery of many items afterwards introduced in evidence.

The officer testified in explanation of his belief as to whether or not the circumstances permitted time in which to obtain a warrant:

"I knew in my own mind at that time that the District Attorney's office was closed and the Justice of the Peace office was closed, and I was afraid that any delay would cause the destruction of any or all of the evidence that might pertain to that automobile."

He further stated that in his opinion the vehicle was an instrumentality used in the commission of the crime.

Lt. Davis then related the information that he had which formed the basis for his belief that the appellant was responsible for the death of Tona Worthington. These were as follows: (a) an admission on the part of appellant that he had been in the vicinity where the small girl had last been seen alive; (b) that at such time he had his German Shepherd dog with him; (c) that when the body of Tona Worthington was found her clothing was covered with animal hair; (d) that the vehicle of appellant was observed to have what appeared to be fresh blood in the back seat on the night of the same day the young girl was reported missing; (e) the body of Tona Worthington was covered with blood: (f) that appellant, when confronted by a young girl witness, denied that they had previously talked about the deceased girl, when they had; (g) that the appellant had previously been charged with a similar

crime while stationed in Germany, involving an eleven year old girl.

The legal principles with which we are concerned are tersely stated in the following quotations:

"Probable cause for a search exists where the facts and circumstances within the knowledge of the officer on the scene and of which he has reasonably trustworthy information would lead a man of reasonable caution and prudence to believe that he will find the instrumentality of a crime or evidence pertaining to a crime." Brown v. State, Tex. Cr.App., 481 S.W.2d 106; Dyke v. Taylor Implement Mfg. Co., 391 U.S. 216, 88 S.Ct. 1472, 20 L.Ed.2d 538 (1968); Brinegar v. United States, 338 U.S. 160, 69 S.Ct. 1302, 93 L.Ed. 1879 (1949); Carroll v. United States, 267 U.S. 132, 45 S. Ct. 280, 69 L.Ed. 543 (1923).

" * * * Assuming the existence of probable cause, automobiles and other vehicles may be searched without warrants 'where it is not practicable to secure a warrant, because the vehicle can be quickly moved out of the locality or jurisdiction in which the warrant must be sought: (Citations Omitted).' Chimel v. California, 395 U.S. 752, 89 S.Ct. 2034, 23 L.Ed.2d 685 (1969).

" * * * For constitutional purposes, we see no difference between on the one hand seizing and holding a car before presenting the probable cause issue to a magistrate and on the other hand carrying out an immediate search without a warrant. Given probable cause to search, either course is reasonable under the Fourth Amendment." Chambers v. Maroney, 399 U.S. 42, 90 S.Ct. 1975, 26 L.Ed.2d 419.

■ Additionally, appellant is not in a position to complain. He voluntarily took the witness stand and testified, without objection, concerning the evidentiary items found in his vehicle and attempted to explain them away. The fact of such admissions constitutes a waiver and renders it immaterial whether the search was made upon probable cause. Moulton v. State, Tex.Cr.App., 486 S.W.2d 334; Palmer v. State, 475 S.W.2d 797; Parker v. State, Tex.Cr.App., 384 S.W.2d 712; Brown v. State, Tex.Cr.App., 457 S.W.2d 917; Tsoi v. State, Tex.Cr.App., 489 S.W.2d 103; Jones v. State, Tex.Cr.App., 484 S.W.2d 745; Bradley v. State, Tex.Cr.App., 478 S.W.2d 527.

We hold that the search was not unreasonable, and overrule ground of error No. 1.

Under his second ground of error the appellant complains that the court erred in forcing him to trial in Eastland County and in not changing the venue.

The offense was alleged to have occurred in Taylor County, and venue was changed to Eastland County, an adjoining county. Much evidence was introduced in the Taylor County hearing of extensive publicity by newspapers, radio and television. The state did not contest the change of venue from Taylor County.

In Eastland County, appellant again sought to have venue changed, which the state contested and the court held a full hearing on July 15, 1971. The evidence in the Taylor County hearing was placed in the record, with additional evidence that the news media from Abilene had extensive coverage in Eastland County, and three defense witnesses who said that public opinion was such that in their opinion Creel could not have a fair trial there. The state called a number of witnesses who expressed the opinion that a fair and impartial jury could be obtained.

The court overruled the motion to change venue and the case went to trial on October 11, 1971, which resulted in a jury verdict of guilty on October 26, 1971, with punishment assessed by the jury at life.

The record contains the voir dire examination of the jurors. Eighty-eight jurors

were examined. Thirty-eight were challenged and excused for cause because of scruples against inflicting the death penalty, which was lawful at that time and was being asked for by the state. Three were challenged and excused because of pre-conceived opinion as to the guilt or innocence of the accused. All of the jurors except two had heard of the case. None of the jurors except those excused for cause were challenged for cause. The defense did not exhaust its peremptory challenges, and there was no showing in the record that any juror who served had formed an opinion as to appellant's guilt or innocence. All were accepted by appellant.

█ Newspaper publicity alone does not establish prejudice or require the change of venue. Jones v. State, 156 Tex. Cr.R. 248, 240 S.W.2d 771. Where appellant did not exhaust his peremptory challenges and did not show that he was forced to accept any objectionable juror, no error appears. Clemons v. State, Tex.Cr.App., 398 S.W.2d 563.

Appellant has not shown an abuse of discretion by the trial court in denying his motion to change venue. Ward v. State, Tex.Cr.App., 427 S.W.2d 876; Taylor v. State, Tex.Cr.App., 420 S.W.2d 601; Turner v. State, Tex.Cr.App., 462 S.W.2d 9; McCutcheon v. State, Tex.Cr.App., 363 S.W.2d 457; Morris v. State, Tex.Cr.App. 488 S.W.2d 768.

We quote from Morris v. State, supra:

"In Irvin v. Dowd, 366 U.S. 717, 81 S. Ct. 1639, 6 L.Ed.2d 751, Justice Clark, speaking for the Court, wrote that it is not required that jurors be totally ignorant of the facts and issues involved in this day of widespread and diverse methods of communication. He also noted that an important criminal case can be expected to arouse interest of the public in the vicinity and scarcely any of those best qualified to serve as jurors will not have formed some impression or opinion as to the merits of the case.

"He further wrote that it is sufficient if the juror can lay aside his impression or opinion and render a verdict based on the evidence presented in court.

"In the present case there is no showing that publicity created a prejudice so great as to prevent a fair trial. It appears that the appellant was tried by jurors who had no opinion as to his guilt and that he received a fair trial.

"Our courts cannot and do not operate in a vacuum. Courts deal with people and crimes which are newsworthy. To require a trial of jurors who had never heard of a highly publicized crime would be impractical if not impossible. Certainly, it was never intended that jurors were to be selected from those who did not read newspapers or keep up with current events through other media. Jurors selected from such a group, if there are enough to be called a group, would not be representative. To hold otherwise would be to hold that the perpetrator of a very highly publicized crime such as the assassination of a president, a governor or any widely known person could never be tried."

We overrule appellant's contention that the trial court erred in not changing the venue from Eastland County.

Next, appellant contends that the parents of the deceased child were permitted to remain in the courtroom during voir dire examination of the prospective jurors.

█ The rule provided for in Article 36.03 Vernon's Ann.C.C.P. et seq., is for the purpose of preventing witnesses from hearing and being informed as to the testimony of other witnesses. The rule has no application to the exclusion of witnesses during voir dire of jurors and before any testimony on the trial has begun.

In this connection, appellant in his brief refers generally to harm from the presence of the parents, but does not point out or show when and in what particular appel-

lant suffered harm, for which reason he fails to show merit.

We overrule this contention.

The next contention of appellant is that the court erred in not keeping the jury together during this trial before the charge was read to the jury.

Article 35.23, V.A.C.C.P., provides, in part:

"When jurors have been sworn in a felony case, the court may, at its discretion, permit the jurors to separate until the court has given its charge to the jury, after which the jury shall be kept together - - -."

Not only does the statute make it discretionary with the court as to such separation, but see also Smith v. State, Tex.Cr. App., 437 S.W.2d 835; Enriquez v. State, Tex.Cr.App., 429 S.W.2d 141; Sierra v. State, Tex.Cr.App., 476 S.W.2d 285.

The court during the trial frequently admonished the jury as to their conduct in not permitting anybody to talk to them about the case, nor to read or listen to anything about it from the news media. There is no showing in the record or claim in appellant's brief that they or any of them did so or that the failure of the court to sequester the jury resulted in harm to appellant.

■ No harm being shown, we hold that the court did not abuse its discretion in failing to sequester the jury throughout the trial.

■ Next, the appellant asserts that the court erred in excluding from the jury those veniremen who stated they could not inflict the death penalty for crime.

Reliance is had upon Witherspoon v. Illinois, 391 U.S. 510, 88 S.Ct. 1770, 20 L.Ed. 2d 776, but this is misplaced because the jury rejected the death penalty and assessed the punishment at life imprisonment. This being so, *Witherspoon* error is not available to him. Bumper v. North Caroli-

na, 391 U.S. 543, 88 S.Ct. 1788, 20 L.Ed.2d 797; Ex Parte Powers, Tex.Cr.App., 487 S.W.2d 101.

Appellant's next contention is that the trial court erred in permitting the state to corroborate and bolster the testimony of its witnesses Leonard Jefferson and Betty Anne Barnes.

We cannot tell from appellant's brief what ruling of the court with reference to what testimony this contention is based upon. We consider that this matter is not presented to us in the manner contemplated by Article 40.09, Sec. 9, V.A.C.C.P., and that justice does not require us to search the record in an attempt to discover the error or errors intended by appellant to be complained of.

■ Appellant contends that the court erred in admitting a drawing by witness Hinojosa as State's Exhibit No. 58.

The witness testified that he passed a red foreign make car he took to be a Volvo, with a man in it with glasses on, and saw part of the head of what he took to be a female child, and the car had a white spot on it that focused his attention. The photograph of appellant's Volvo had such a large spot. This was in a wooded area between the school and Tona's home, near a bridge across the creek, shortly after 5 P. M. on March 15, 1971.

The witness was an artist, and some time later made a water color drawing of his recollection and impressions, which was admitted as State's Exhibit No. 58. While the witness admitted that all of his impressions as shown in the drawing were not accurate, we see no reason why a witness cannot express himself in this manner as well as by words and objections went more to the weight of the evidence than to its admissibility. The details admitted to be inaccurate were of minor importance. The drawing, in its essential facts, corresponded to the picture painted by words in his testimony. We hold this evidence to be admissible. Martin v. State, Tex.Cr.App.,

475 S.W.2d 265; Terry v. State, Tex.Cr. App., 491 S.W.2d 161.

We find no reversible error and the judgment is affirmed.

Opinion approved by the Court.

ODOM, Judge (concurring).

I agree that ground of error No. 1 (concerning the search of the automobile) was correctly disposed of but only for the reason, as stated in the majority opinion, that the appellant ". . . voluntarily took the witness stand and testified, without objection, concerning the evidentiary items found in his vehicle and attempted to explain them away. The fact of such admissions constitutes a waiver and renders it immaterial whether the search was made upon probable cause."

ROBERTS, J., joins in this opinion.