**James Duke CREEL, Petitioner,**

v.

**W. J. ESTELLE, Jr., Director, Texas Department of Corrections, Respondent.**

**Civ. A. No. 1–74–24.**

United States District Court, N. D. Texas, Abilene Division.

May 2, 1977.

---

16. *State v. Miller,* 211 S.C. 306, 45 S.E.2d 23 (1947). Also, see *Cram v. United States,* 316 F.2d 542 (10th Cir. 1963).

James Duke Creel, pro se.

John L. Hill, Atty. Gen. of Texas, Austin, Tex., for respondent.

## MEMORANDUM OPINION

BREWSTER, District Judge.

This habeas corpus action seeks to set aside petitioner's conviction for murder with malice and life sentence in Cause No. 12,015, the *State of Texas vs. James Duke Creel*, after a trial by jury in the 91st District Court of Eastland County, Texas. The conviction was affirmed on direct appeal. *Creel v. State*, 493 S.W.2d 814 (Tex. Cr.App., 1973).

The two grounds alleged are quoted from the petition:

"A. Petitioner's State trial conviction was obtained through an illegal search and seizure without Probable Cause. Without an arrest warrant and without a search warrant, in violation of Article 1—Section 9 of the Texas Constitution, and rights afforded by the Fourth and Fourteenth Amendments of the United States Constitution.

"QUESTION INVOLVED

"Whether Petitioner was denied the Protection of the Due Process Clause of the Fourteenth Amendment by the use at trial of evidence seized in violation of the Constitutions (sic) Fourth Amendment.

"B. Petitioner was denied Due Process of law under the Fifth and Fourteenth Amendments of the United States Constitution when he was denied an impartial fair trial free from community hostility and prejudicial pre-trial publicity due to the Court's denying A Motion for Change of Venue.

"QUESTION INVOLVED

"Whether the denial of a Change of Venue to a county not saturated by prejudicial pre-trial news coverage denied Petitioner a Fair and Impartial Jury in violation of the due process standards afforded by the Fifth and Fourteenth Amendments of the United States Constitution."

After filing the application, in a pleading entitled, "Notice to Withdraw Allegation B", petitioner pointed out that his original Petition for Writ of Habeas Corpus contained a ground, which he described as "Allegation B", that challenged the venue of the trial. He then proceeded to say:

"At this time Petitioner Creel withdraws this allegation 'B' in that it is petitioner's firm belief that the search and seizure issue raised in the application for writ of habeas corpus warrants relief and that the Court's time would be best served if devoted to said claim, i. e., the search and seizure contention raised under ground 'A' in the original application for writ of habeas corpus.

"Petitioner most respectfully, therefore, abandons allegation 'B' and urges the Court to focus its attention upon the remaining claim.[1] "

In his "Memorandum in Support of Application for Writ of Habeas Corpus" filed

1. It appears that the petitioner was not abandoning much. The case was tried in a county different from the one where the crime was committed. Only a few of the veniremen had heard enough about the case to form an opinion. The court sustained all of petitioner's challenges for cause. Petitioner did not exhaust all of his fifteen peremptory challenges. The case was the kind where a jury could well have assessed the death penalty, and the State

herein, petitioner further narrows the issue before this Court by conceding that there was probable cause for his arrest. The following is quoted from page 6 of that Memorandum:

"Petitioner concedes the fact that Lt. Davis had 'probable cause' to arrest him on March 16, 1971 at 5:10 P.M., but that the 'burden is on the State to show that the exigencies of the situation make a search without a warrant imperative,' *Coolidge v. New Hampshire*, 403 U.S. 443 [91 S.Ct. 2022, 29 L.Ed.2d 564] (1971)."

The only question now before the Court is whether the admission in evidence at the murder trial of some of the fruits of the search of petitioner's automobile, taken into possession at the time of petitioner's arrest, is ground for setting aside his conviction and sentence.

Petitioner has filed no habeas corpus action in the state court; but his habeas corpus petition here should nevertheless be considered, because the questions presented in such petition were thoroughly litigated in the state court, both on the trial and the appellate level. The transcript of the proceedings in the murder trial, containing more than 2,000 pages, is a part of the record in the present action. The opinion of the Court of Criminal Appeals affirming petitioner's conviction is reported at 493 S.W.2d 814. They show that petitioner has effectively exhausted his state court remedies. *Reed v. Beto*, 5 Cir., 343 F.2d 723 (1965), affirmed 385 U.S. 554, 87 S.Ct. 648, 17 L.Ed.2d 606; *Robinson v. Beto*, 5 Cir., 473 F.2d 665 (1973).

The application for writ of habeas corpus and the files and records of the case conclusively show that petitioner is not entitled to the relief prayed for. *Stone v. Powell*, 428 U.S. 465, 96 S.Ct. 3037, 49 L.Ed.2d 1067 (1976). The application should therefore be denied without an evidentiary hearing. *Broxson v. Wainwright*, 5 Cir., 372 F.2d 944 (1967); *Rogers v. Wainwright*, 5 Cir., 394

F.2d 492 (1968); *Hernandez v. Scheckloth*, 9 Cir., 425 F.2d 89 (1970); *Mackey v. Oberhauser*, 9 Cir., 437 F.2d 120 (1971).

The overwhelming evidence showed that petitioner, then thirty-three years old, was guilty of a brutal rape and murder of a ten year old girl who was intercepted on her way home from Reagan Elementary School in Abilene. Tona left the school playground about 4:15 p. m. on March 15, 1971, after softball practice to walk to her home about a mile away. She never got home. After an intense search that lasted through the night and a good part of the next day, her lifeless body was found about 3:00 p. m. stuffed into a culvert in a rural area about nine miles from her school.

For some time prior thereto, a man had been prowling the vicinity of the Reagan Elementary School trying to entice young girls into his automobile.[1-a] A number of distinctive circumstances indicated that it was the same man on each occasion. His automobile was a red Volvo sedan with orange and yellow flower decals on it. A large German Shepherd dog was usually in the car with him. The several girls ranged in age from nine to sixteen. Some of them were frightened by the man's advances and ran home, followed by him in the red Volvo. At least a couple of parents, and two of the older girls, took down the license number of the car. The license number showed that the car belonged to petitioner. Some of the girls saw a tatoo on the man's arm.[1-b]

A few days before the murder, a little red car with flower decals on it turned into the Worthington driveway and stopped near where Tona and her sister were playing in the yard. Mrs. Worthington saw the car, and came out of the house toward it. She said the car "got out real quick, and slung gravel all over the girls".

On the afternoon of the murder, petitioner stopped two school girls near the Reagan Elementary School, and asked them several questions about Tona Worthington, includ-

made a strong effort to get such a verdict. The petitioner got only a life sentence.

**1–a.** Details of these incidents appear in the narrative statement of facts in the opinion of the Texas Court of Criminal Appeals.

**1–b.** Creel had a tatoo on his arm in the place and fitting the description of the one Barbara Durr and Teresa Jenkins, two school girls, saw on the arm of the man who harassed them.

ing ones about her age and how she was dressed that day. A short time thereafter, Tona left the school playground to go home, carrying a paper sack containing popcorn, three Snicker bars and some bubble gum. Her direct route home would have taken her west on Hartford Street and across Elm Creek. She was seen by a Mrs. Coffey, walking west on Hartford near the wooded area of the creek about 4:35 p. m. Shortly thereafter, a Mrs. Johnson saw a little red car with yellow flower decals on it moving slowly alongside a young girl she did not know. The man was giving the girl some attention, and she was backing away. The car drove away as Mrs. Johnson approached. At about 5:00 p. m., Sergeant Hinojosa drove by the small red car parked near Elm Creek, and saw a man and a small female child with her head bent forward in the front seat. The red car drove off at a high rate of speed. About an hour later, petitioner was seen driving his little red car on the old Anson Road about 1½ miles from where Tona's body was found the next day. Grass and brush were hanging on the underside of the car. Shortly prior thereto, some passengers in an automobile travelling along the same road saw the red car stopped there with the lid and hood raised, less than a mile from the place where the body was found. A man had his head under the hood, and the car door was open. One of the occupants of the passing car testified on the trial that a coat there exhibited to her appeared to be the same as one she saw on the seat of the red car on the occasion above mentioned.

When Tona's body was found, it was behind a roll of wire in the culvert. Her skirt, coat and blouse had dog hair on them. A competent expert found the hair to be similar in color and structurally identical to samples of hair from petitioner's German Shepherd, and dissimilar to the hair of the Worthington dog. A large amount of "haygrazer", a stock feed, was found on the girl's clothes and in her hair. The underportion of petitioner's car bore some of the same substance when it was taken into custody.

The doctor who performed the autopsy testified that Tona's death was due to strangulation. There were also injuries to her head and other parts of her body which caused a great deal of bleeding, but not her death. The autopsy revealed that Tona had been raped by a man who had had a vasectomy,[2] and whose blood was Type "A". Type "O" blood was found on Tona's body and clothing and in the car.[3] The evidence showed that Tona's blood was Type "O" and that petitioner's was Type "A".

Information gained during the search for the body made petitioner the prime suspect. Officers found out about his prowling the neighborhood accosting the young school girls. He was identified by the description and license number of the car, as well as by its somewhat unusual appearance. They knew that he had made inquiry about Tona's whereabouts a short time before she was last seen. They had interviewed petitioner during the course of the investigation, prior to the finding of the body; and, while he admitted having been in the area of the school on March 15th, he denied that he asked anyone for information about Tona. Abilene Police Officer Dodgen went with Lt. Davis when petitioner was interviewed. He saw fresh blood on the back seat of the red Volvo with the flower decals on it and on a bedspread on the back seat.

As soon as possible after finding the body, Lt. Davis and Officer McDowell, of the Abilene Police Department, went to the trailer park where the petitioner lived. Petitioner did not arrive there until about 5:10 p. m. Lt. Davis then arrested him and took possession of his car and impounded it as an instrument of the crime.

A search of the car produced much evidence that was used against the petitioner on the murder trial. Some of the items themselves and photos of a number of others were admitted in evidence after the trial court had held a hearing out of the

---

2. This was learned from the fact that the semen contained no sperm. The proof showed that petitioner had had a vasectomy in 1964.

3. The blood in the car was on the upholstery inside the car, on the trunk lid and in the trunk, indicating that Tona was killed in the car, and her body was then put in the trunk.

presence of the jury on the legality of the search. Included in the evidence admitted as fruits of the search were:

1. Photos of the car itself showing the flower decals.

2. Photos of items which had human blood on them, such as particles from the rear floor mat, and of the back seat upholstery, the trunk latch mechanism, the tool box in the trunk, a bloodsoaked bedspread from the trunk, and of the deck lid of the automobile.

3. Photos of a Snicker Bar and of popcorn found in the car.

4. Photos of the underside of the car showing many particles of "haygrazer" like those found on the clothing Tona was wearing the afternoon when she was killed.

5. Photos of hair taken from the inside of the car.[4]

6. Photos of handcuffs and a bicycle tire.

7. Photos of the license plates on the car, of the rear of the car, of the rear part of the exhaust pipe, and of the car keys.

8. Evidence resulting from the taking of blood samples from various portions of the car, such as the trunk lid of the car and the tool box in the trunk, and the floor mat from the rear seat area. It was all Type "O" human blood, the same as that found on the coat and blouse Tona was wearing. The cloth of the bloodstained bedspread did not respond to the blood testing procedures.

9. Evidence that the trunk mat of the car was missing, and that the floor in the trunk was clean and slick as though the mat had been recently removed.

The legality of the search was upheld by the trial court and the Texas Court of Criminal Appeals. Texas practice does not require a trial court to justify in writing its rulings during a trial, and there is none here. However, the opinion of the Texas Court of Criminal Appeals does discuss the legality of the search in detail. It shows that admission in evidence of the fruits of the search was upheld upon the grounds that: (1) There was probable cause for the search under the rules announced in *Carroll v. United States*, 267 U.S. 132, 45 S.Ct. 280, 69 L.Ed. 543 (1923); *Brinegar v. United States*, 338 U.S. 160, 69 S.Ct. 1302, 93 L.Ed. 1879 (1949); *Chimel v. California*, 395 U.S. 752, 89 S.Ct. 2034, 23 L.Ed.2d 685 (1969); *Chambers v. Maroney*, 399 U.S. 42, 90 S.Ct. 1975, 26 L.Ed.2d 419 (1970). (2) The petitioner waived his right to complain by voluntarily taking the witness stand in the trial on the merits before the jury concerning the evidentiary items found in his car, and attempting to explain them away. *Tsoi v. State*, Tex.Cr.App., 489 S.W.2d 103; *Moulton v. State*, Tex.Cr.App., 486 S.W.2d 334; *Jones v. State*, Tex.Cr.App., 484 S.W.2d 745; *Bradley v. State*, Tex.Cr.App., 478 S.W.2d 745; *Palmer v. State*, Tex.Cr. App., 475 S.W.2d 797; *Brown v. State*, Tex. Cr.App., 457 S.W.2d 917; *Parker v. State*, Tex.Cr.App., 384 S.W.2d 712.

The legality of the search might also well have been upheld "because seizure of the car was justifiable in light of its integral relationship with the crime being investigated, a contemporaneous search closely related to the reason for impounding and retaining the car, when there was probable cause to believe that the car contained fruits, instrumentalities, or evidence of the crime, did not violate the Fourth Amendment." *United States v. Shye*, 6 Cir., 473 F.2d 1061, 1065–66 (1973). The car itself was an instrumentality of the crime and thus subject to impoundment as evidence. 473 F.2d, at 1065.

In *Stone v. Powell*, supra, the Supreme Court had before it the question of "whether a federal court should consider, in ruling on a petition for habeas corpus relief filed by a state prisoner, a claim that evidence obtained by an unconstitutional search or seizure was introduced at his trial, when he had previously been afforded an opportunity for full and fair litigation of his claim in the state courts." (428 U.S., at 469, 96 S.Ct., at 3039). The Court's answer to such question appears in the following language quoted from the majority opinion:

"In sum, we conclude that where the State has provided an opportunity for full

---

4. Tona's coat with hair on it was found in the culvert with her body.

and fair litigation of a Fourth Amendment claim, a state prisoner may not be granted federal habeas corpus relief on the ground that evidence obtained in an unconstitutional search or seizure was introduced at his trial. In this context the contribution of the exclusionary rule, if any, to the effectuation of the Fourth Amendment is minimal, and the substantial societal costs of application of the rule persist with special force." (428 U.S., at 494–95, 96 S.Ct., at 3052).

The facts herein stated show not only that petitioner was afforded a full and fair opportunity for litigation of his Fourth Amendment claim, but that he took full advantage of that opportunity. Under such circumstances, petitioner is not entitled to habeas corpus in federal court upon his contention that fruits of the claimed illegal search and seizure of his car were admitted in evidence against him in his murder trial.

An order will be entered denying petitioner's application for writ of habeas corpus.