Leonard Wilson FREEMAN, Appellant,

v.

The STATE of Texas, Appellee.

No. 51505.

Court of Criminal Appeals of Texas.

May 18, 1977.

Rehearing Denied June 14, 1977.

Olin B. Strauss, Pleasanton, R. Thomas Franklin, Jourdanton, for appellant.

J. Taylor Brite, Dist. Atty., Robert C. Koehl, County Atty., Jourdanton, Jim D. Vollers, State's Atty., and David S. McAngus, Asst. State's Atty., Austin, for the State.

## OPINION

GREEN, Commissioner.

Leonard Wilson Freeman appeals from a conviction for capital murder in which the punishment was assessed at death. The indictment in the case charged:

". . . that on or about the 19th day of July, 1973, and before the presentment of this indictment, in the County of Atascosa and State of Texas, LEONARD WILSON FREEMAN (hereinafter called Defendant) did then and there unlawfully, wilfully, and with malice aforethought, voluntarily kill LUIS GARZA, a peace officer, to-wit, a Deputy Sheriff of Atascosa County, State of Texas (who was then and there acting in the lawful discharge of an official duty and who the defendant knew was a peace officer) by shooting him with a gun."

The record reflects the following evidence concerning this offense:

On July 19, 1973, appellant was driving from San Antonio toward Cotulla in a 1973 Vega coupe, with the intention of joining confederates in a robbery at a bank in Cotulla. He stopped at Charlotte, in Atascosa County, where he purchased some implements to be used in the robbery. In leaving Charlotte he got on the wrong road, and after becoming aware of his mistake turned back on the highway toward Charlotte intending to proceed to Cotulla. He was stopped near Charlotte for speeding by Deputy Sheriff Luis Garza, who was driving a fully marked Atascosa County patrol car, a 1973 Dodge. Elida Garza, wife of Luis Garza, was also in the Dodge. Witnesses observed Luis Garza writing a ticket, and next saw appellant with a pistol pointed toward the Garzas. Next, witnesses saw Luis Garza and appellant get in the officer's car and Elida Garza get in the Vega coupe. Both cars then left. Another witness later observed the cars turn off the highway onto a dirt road which led to an empty farm house in a secluded area. Atascosa County officers were notified. Shortly thereafter the bodies of Luis and Elida Garza were found in the farm house. Elida Garza was dead from a bullet wound in the back of her head. Handcuffs were attached to one of her wrists. Officer Luis Garza had three wounds in his head, but was still alive. He was taken to a hospital in San Antonio, where he died a few hours later. The evidence establishes that the death of both of the Garzas was caused by bullets fired from a .38 caliber pistol which appellant had in his Vega coupe when stopped by the deputy sheriff. Both the Dodge and Vega were found behind a barn at the scene of the shooting, with fingerprints of appellant being found on the door handle of the Dodge. The officer's pistol, shotgun, and a 30–30 caliber rifle, known to have been carried in his car, were missing. The evidence, including the written confession of appellant, establishes that appellant fired the shots causing the death of Luis Garza and his wife.

After shooting the Garzas, the evidence reflects that appellant cut across a field to the farm house of Melvin Jones. He burglarized the house (nobody was at home at the time) and stole a .410 gauge shotgun, a .303 rifle and some shells. He changed clothes there, leaving Officer Garza's hat. By "hot-wiring" the starter, he stole a 1969 Ford Ranchero and drove into Charlotte where he bought some gasoline. He next stopped at the Otto Mann home several miles form Charlotte where, using Officer Garza's pistol, he forced his way into the house, tied up those present, stated he had just killed a deputy sheriff and "they" had better do what he says, took a billfold from James Mann, dropped a piece of paper on which was a sketch of the Cotulla bank, left the Ford Ranchero and stole a 1972 Mercury car, and left on the highway to Pearsall. He was subsequently arrested while in the Mercury in Medina County by Texas Department of Public Safety officers.

A full *Miranda*-type[1] warning of his rights was give him by one of the arresting officers. Later he was taken before a magistrate in Devine, who explained to him his rights as provided in Article 15.17, V.A.C.C.P. He was again advised fully and at length of his Miranda and statutory rights by District Attorney J. Taylor Brite. Thereupon, after acknowledging orally and in writing that he understood his rights of counsel and silence, he made and executed a lengthy written confession of the offenses hereinabove referred to, including the shooting of Officer Luis Garza and his wife Elida Garza.

A few days later appellant along with other prisoners escaped from the Medina County jail, where he was being confined for safe-keeping. In San Antonio, by exhibiting a gun, he attempted to force Eldorado Dibbel to take him out on a highway, telling Dibbel he had already killed a deputy and his wife and didn't want to have to kill him. However, in a struggle Dibbel overcame appellant and took the gun from him. Appellant was rearrested and has been confined since that time.

Appellant did not testify, and offered no evidence. In arguing to the jury, defense counsel admitted his guilt of murder, arguing only that he should not be convicted of capital murder or assessed the death penalty.

At the punishment stage, the evidence reflected a number of prior convictions for felony offenses.

In grounds of error 7–15 inclusive appellant contends the court erred in failing to sustain defense challenges to certain named prospective jurors "after they had admitted a bias or prejudice against the appellant." Appellant's complaints are addressed to the voir dire of panel members Ogden, Cooper, Mangum, Burke, Cruz, Valdez, Hooge, Ruple and Oakley. Some of these were excused on appellant's peremptory challenges after his challenges for cause had been overruled. Others, to-wit, Mangum, Hooge, Ruple and Oakley, served as trial jurors since prior to their selection appellant had exhausted all of his peremptory challenges and his challenges for cause were overruled.

■ Each of the panel members named above stated on voir dire that he or she had heard of the offense at the time it occurred, either by reading of it in the newspapers or by hearing over radio and viewing television broadcasts, or by two or all of such means. Some, because of what they read, heard or discussed, originally formed opinions of guilt and prejudice unfavorable to appellant. However, when examined as to any present prejudice and opinion, each of the persons complained of stated definitely that he or she had no present prejudice against appellant or an opinion which would influence a verdict, and if selected on the jury would disregard any opinion and feeling formed earlier, and would decide the case entirely upon the evidence heard in the courtroom. Any present prejudice existing in the minds of the jurors was against the commission of the crime charged, and not personally against appellant. A juror is not disqualified because he is merely prejudiced against the commission of a crime. *Chamberlain v. State*, Tex.Cr.App., 453 S.W.2d 490; *Wilson v. State*, Tex.Cr.App., 436 S.W.2d 542.

Art. 35.16(a)(8), V.A.C.C.P., provides:

"(a) to challenge for cause is an objection made to a particular juror, alleging some fact which renders him incapable or unfit to serve on the jury. A challenge for cause may be made either by the state or the defendant for any one of the following reasons:

\* \* \* \* \* \*

"(8) That he has a bias or prejudice in favor of or against the defendant."

■ The above statute does not provide that one who had at a time prior to trial entertained a prejudice against the defendant was subject to a challenge for cause. It uses the present tense, as of the time the prospective juror is being examined. None

1. *Miranda v. Arizona*, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694.

of the persons named by appellant testified that he or she *"has* a bias or prejudice in favor of or against the defendant." In view of the answers of each of the above named prospective jurors on voir dire that he or she did not have a prejudice against appellant, and that he or she would enter the jury with an open mind and try the case strictly on the evidence, no abuse of the court's discretion is shown in overruling appellant's challenges for cause. We quote as follows from *Adami v. State,* Tex.Cr. App., 524 S.W.2d 693, at p. 700:

"[11] Juror Woodal, on voir dire, stated he had formed an opinion from what he had heard and read concerning appellant's guilt or innocence, and at first equivocated some as to whether it would influence his verdict. However, he stated definitely upon examination by the court that he would not, as a juror, be influenced by anything he had heard or read about the case, and in answer to a question by defense counsel, answered as follows:

" 'Q I gather then that you feel that even though you have had previous exposure that you can overcome that and try to render a fair and impartial verdict, based on what you hear here in the courtroom, and not what you heard previously?

" 'A I think I can, I know I can.

" 'Q You know you can?

" 'A Yes.'

"The testimony of Woodal on voir dire, when taken as a whole, does not reflect that he was disqualified from serving on the jury. *Scott v. State,* Tex.Cr.App., 490 S.W.2d 578."

In *Stephenson v. State,* 494 S.W.2d 900, this Court stated:

"An objectionable juror, in the sense in which the term is used in this connection, 'means one against whom such cause for challenge exists as would likely affect his competency or his impartiality in the trial.' *Hudson v. State,* 28 Tex.App. 323, 13 S.W. 388, 389. Without some such showing, it is idle simply to say that a juror is objectionable."

And in *Hafti v. State,* 487 S.W.2d 745, this Court, in a statement applicable to appellant's contentions, said:

"It is apparent that, when questions which had been propounded to Murphy were explained by the court, without objection, Murphy was shown to be clearly qualified and the overruling of the challenge for cause as to him presents no error."

In *Murphy v. Florida,* 421 U.S. 794, 95 S.Ct. 2031, 44 L.Ed.2d 589 (1975) the Supreme Court said:

"[4–6] The constitutional standard of fairness requires that a defendant have 'a panel of impartial, "indifferent" jurors.' *Irvin v. Dowd,* supra, 366 U.S. [717] at 722, 81 S.Ct. [1639] at 1642, [6 L.Ed.2d 751]. Qualified jurors need not, however, be totally ignorant of the facts and issues involved.

" 'To hold that the mere existence of any preconceived notion as to the guilt or innocence of an accused, without more, is sufficient to rebut the presumption of a prospective juror's impartiality would be to establish an impossible standard. *It is sufficient if the juror can lay aside his impression or opinion and render a verdict based on the evidence presented in court.'* Id., at 723, 81 S.Ct. at 1642.

"At the same time, the juror's assurance that he is equal to this task cannot be dispositive of the accused's rights, and it remains open to the defendant to demonstrate 'the actual existence of such an opinion in the mind of the juror as will raise the presumption of partiality.' Ibid.

\* \* \* \* \* \*

"The voir dire in this case indicates no such hostility to petitioner by the jurors who served in his trial to suggest a partiality that would not be set aside. Some of the jurors had a vague recollection of the robbery with which petitioner was charged and each had some knowledge of petitioner's past crimes, but none betrayed any belief in the relevance of petitioner's past to the present case. . . ." (Emphasis added)

See also *Howell v. State*, 171 Tex.Cr.R. 545, 352 S.W.2d 110; *Parsons v. State*, 160 Tex.R. 387, 271 S.W.2d 643; *Klinedinst v. State*, 159 Tex.Cr.R. 510, 265 S.W.2d 593.

The voir dire of the panel members complained-of in these grounds of error fails to show that they would be influenced as jurors by any opinion or prejudice theretofore entertained or by anything they may have read or heard about the case. The court did not err in overruling appellant's challenges for cause.

Likewise, the voir dire of Ruple and of Mangum fails to show that either would be influenced as a juror by anything they may have heard or read concerning appellant's criminal record, as contended in appellant's 17th and 18th grounds. See *Murphy v. Florida*, supra; *Adami v. State*, supra. Also, as in *Adami*, practically all that these panel members had heard about his past record was shown by the evidence at the trial.

Grounds of error 7–15 inclusive and 17–18 are overruled.

■ In his 16th ground, appellant complains of the refusal of the court to propound to the entire jury panel the following two questions:

"(1) Is there established in anyone's mind a conclusion as to the guilt or innocence of the accused, Leonard Wilson Freeman?

"(2) Would such conclusion so established influence your verdict?"

Appellant relies as authority for his contention on Art. 35.17, Sec. (2), V.A.C.C.P., which reads:

"2. In a capital felony case, the court shall propound to the entire panel of prospective jurors questions concerning the principles, as applicable to the case on trial, of reasonable doubt, burden of proof, return of indictment by grand jury, presumption of innocence, and opinion. Then, on demand of the State or defendant, either is entitled to examine each juror on voir dire individually and apart from the entire panel, and may further question the juror on the principles propounded by the court."

The record reflects that the judge gave extensive instructions to the jury panel which cover nine pages of the record. These include instructions on matters of reasonable doubt, burden of proof, return of indictment by grand jury, presumption of innocence, and prejudice and opinion. After such instructions and admonishments, the court stated:

"Let me ask this: Are there any of you who feel like you do not understand these instructions? If so, please hold up your hands. Are there any of you who feel like you cannot follow these instructions that I have just given you _ _ _?"

Thereafter, the State and appellant were given the opportunity, which was exercised by both parties, to examine each member of the panel on voir dire individually and apart from the entire panel.

Error is not presented.

In his first ground of error, appellant complains of the court's overruling his motion for a change of venue. Said motion alleged (1) that so great a prejudice existed against him in Atascosa County that he could not obtain a fair and impartial trial in that county and (2) also complained of the "newspaper, television, radio and magazine publicity which has been circulated, published and broadcasted."

A hearing was conducted on appellant's motion and the State's sworn reply on February 28, 1974, a little over seven months after the offense and seven weeks prior to the trial. It was shown that the population of Atascosa County according to the 1970 census was 18,696 with a small increase since. The number of households is given at 5,300. The total number of registered voters at the date of the hearing was 9,580. The principal towns included Pleasanton, population 5,300; Jourdanton, the county seat, less than Pleasanton; Poteet, about 3,000 population; Charlotte, about 1,300; Lytle, population not given. Atascosa County lies south of and adjacent to Bexar

County and is within the range of the three television stations and all radio stations broadcasting from San Antonio. The San Antonio Express, San Antonio Evening News, and San Antonio Light have reasonably large distribution in the county in relation to its total population.

Appellant called as witnesses representatives of the television and radio stations in San Antonio and of the above named newspapers, and also representatives of the Pleasanton Express and Atascosa County News. Copies of articles and pictures appearing in those papers mostly immediately and shortly after the date of the offense stating the facts of the offenses above mentioned, appellant's confession, his escape and subsequent re-capture, his past criminal record, the presentment of the indictment, and the various court pre-trial hearings, were placed in evidence, as well as copies of the local papers up to the date of the trial with stories regarding the case. Likewise, copies of television broadcasts with pictorial views of scenes connected with the murders and descriptions of the funerals of the Garzas and radio broadcasts are included in the record. The evidence indicated that most of the news media coverage occurred in the weeks immediately following the commission of the offense and that the publicity was not renewed to any great extent until shortly prior to the trial.

The witnesses who testified that in their opinion appellant could not obtain a fair and impartial trial in Atascosa County included the entire county bar except the district and county attorneys. Most of these lawyers agreed that the talk against appellant was much greater immediately after the offense than at the present time; however, they were each of the opinion that because of the notoriety given the case and the publicity given the approaching trial it would be difficult to obtain an unprejudiced jury in the county. Other witnesses, including an Episcopal priest and a Baptist minister, testified that in their opinions a fair and impartial trial of appellant could not be had in Atascosa County. The record also reflects that a fund for the benefit of the Garzas four small children was created,

with each of the five banks in the county acting as collecting agents. Benefit dances for the fund were sponsored in Poteet, Pleasanton and Charlotte.

In rebuttal, the State used a number of witnesses from various parts of the county who expressed the opinion that appellant could obtain a fair and impartial trial in Atascosa County. Milton Hurley, an operator of an auto parts store in Pleasanton for 23 years, testified that while the people were horrified at the time of the killing he had heard very little of the case in the past six months. George Harris, a merchant in Lytle for 25 years, had not heard the killing discussed "since right after it happened." He thought appellant could receive a fair trial in the county. Other witnesses who testified that the talk against appellant had died down since shortly after the commission of the offense included Byron Cough, a merchant from Poteet; Walter Pursch, an automobile dealer in Pleasanton for 47 years; Rodney Mertz, a merchant from Pleasanton; Paul Bishop, a retired person from Pleasanton; Franklin Little, municipal court judge of Pleasanton; Burt Powell, police chief of Pleasanton and special ranger for the Cattle Raisers' Association; Murry Potts, a 40 year resident of Atascosa County. Each of these witnesses, and also Robert Koehl, county attorney, and J. Taylor Brite, district attorney, expressed the opinion that appellant could receive a fair and impartial trial in Atascosa County.

Fact issues as to whether appellant would or would not be likely to obtain a fair and impartial trial before an Atascosa County jury were raised by the evidence at the pre-trial hearing. These issues were decided adversely to the contentions of appellant when the trial court, the trier of the facts, overruled the motion for a change of venue. See *Ransonnette v. State*, Tex.Cr.App., 522 S.W.2d 509; *Chappell v. State*, Tex.Cr.App., 519 S.W.2d 453. However, the issue was again raised when the case was called for trial on April 22nd, when appellant renewed his motion for a change of venue. This request was re-urged during the voir dire of the first of three lists of jurors summoned

for the trial, was again raised when the court ordered additional prospective jurors summoned, was presented again after the completion of the voir dire of the second panel, and again after the twelfth trial juror had been selected and sworn. Each time the motion for a change of venue was overruled.

As stated by the Supreme Court in *Sheppard v. Maxwell,* 384 U.S. 333, 86 S.Ct. 1507, 16 L.Ed.2d 600, quoted in *Pamplin v. Mason,* 364 F.2d 1 (5th Cir.) and by this Court in *Adami v. State,* 524 S.W.2d 693, and *Morris v. State,* 488 S.W.2d 768,

"Due process requires that the accused receive a trial by an impartial jury free from outside influences. Given the pervasiveness of modern communications and the difficulty of effacing prejudicial publicity from the minds of the jurors, the trial courts must take strong measures to ensure that the balance is never weighed against the accused . . ."

Thus, we find it proper that we consider the voir dire of the prospective jurors to determine whether appellant was tried by an "impartial jury free from outside influences." See *Adami v. State, supra; Pamplin v. Mason, supra.*

A review of the record of the voir dire examination reflects that of the prospective jurors drawn and ordered summoned 109 were actually examined before the jury was completed. At least 94 of those examined had heard or read of the case. 7 were excused because they could not read or write, and 9 because of conscientious scruples against inflicting the death penalty. Many of those examined stated they had previously formed an opinion of appellant's guilt from what they had heard or read, and many of those stated they could and would disregard such opinions and decide the case strictly on the evidence if selected and sworn as a juror; however, 55 were excused for cause because of fixed opinion which would influence their verdict, or bias or prejudice or close acquaintance with the deceased.

The record reflects that appellant used his fifteen peremptory challenges plus three additional challenges given him by the court and requested an additional peremptory challenge thereafter when each challenge for cause was overruled, but such requests were denied.

However, we find that, although the large majority of the prospective jurors had heard and read of the case, all of the twelve who served on the trial jury testified that he or she could and would try the case strictly on the evidence introduced and would base the verdict on what was heard and observed in the courtroom. We have already discussed the panel members of whom appellant complains on appeal and have found that they properly qualified to serve. See quote from *Murphy v. Florida, supra.* We find no evidence that appellant did not receive a trial by an impartial jury free from outside influences. See *Sheppard v. Maxwell, supra,* 384 U.S. 333, 86 S.Ct. 1507, 16 L.Ed.2d 600; *Pamplin v. Mason, supra; Adami v. State, supra; Knight v. State,* Tex.Cr.App., 538 S.W.2d 101; *Morris v. State,* Tex.Cr.App., 488 S.W.2d 768; *Chappell v. State, supra; Taylor v. State,* Tex.Cr.App., 420 S.W.2d 601; *Clifford v. State,* Tex.Cr.App., 424 S.W.2d 233.

In *Adami v. State, supra,* we quoted from *Morris v. State, supra,* as follows:

" 'In *Irvin v. Dowd,* 366 U.S. 717, 81 S.Ct. 1639, 6 L.Ed.2d 751, Justice Clark, speaking for the Court, wrote that it is not required that jurors be totally ignorant of the facts and issues involved in this day of widespread and diverse methods of communication. He also noted that an important criminal case can be expected to arouse interest of the public in the vicinity and scarcely any of those best qualified to serve as jurors will not have formed some impression or opinion as to the merits of the case.

\* \* \* \* \* \*

" 'Our courts cannot and do not operate in a vacuum. Courts deal with people and crimes which are newsworthy. To require a trial of jurors who had never heard of a highly publicized crime would be impractical if not impossible. Certain-

ly, it was never intended that jurors were to be selected from those who did not read newspapers or keep up with current events through other media. Jurors selected from such a group, if there are enough to be called a group, would not be representative. To hold otherwise would be to hold that the perpetrator of a very highly publicized crime such as the assassination of a president, a governor or any widely known person could never be tried.'

"See, also *Garcia v. State, supra,* [Tex.Cr. App., 513 S.W.2d 82]; *Creel v. State,* Tex. Cr.App., 493 S.W.2d 814; *Taylor v. State,* Tex.Cr.App., 420 S.W.2d 601."

■ We have examined the contents of the newspaper accounts and television and radio broadcasts and find them to be fair and designed for the purpose of informing the public of current events. The fact of publicity in the news media does not by itself establish prejudice or require a change of venue. *Knight v. State, supra; Garcia v. State,* Tex.Cr.App., 513 S.W.2d 82; *Creel v. State,* Tex.Cr.App., 493 S.W.2d 814; *Adami v. State, supra; Morris v. State, supra; Murphy v. Florida, supra* (95 S.Ct. 2031); *Irvin v. Dowd, supra; Pamplin v. Mason, supra.*

■ We conclude that the trial court did not abuse its discretion in overruling appellant's motion for a change of venue and in conducting the trial in Atascosa County.

In grounds of error 2, 3, 4, 5, and 6, appellant contends the court erred in excusing, on the State's challenge for cause, prospective jurors Little, Southern, Crouch, Shely and Castillo because of their "general" opposition to the infliction of the death penalty. See *Witherspoon v. Illinois,* 391 U.S. 510, 88 S.Ct. 1770, 20 L.Ed.2d 776.

**2.** V.T.C.A. Penal Code, Sec. 12.31. Capital Felony.

"(a) An individual adjudged guilty of a capital felony shall be punished by confinement in the Texas Department of Corrections for life or by death.
"(b) Prospective jurors shall be informed that a sentence of life imprisonment or death

■ Little testified on voir dire when examined by the State that he could not under any circumstances impose the death penalty "regardless of how bad the facts must be or how heinous the facts might be or whatever the facts might be" in any case in which he was not an eyewitness to the crime. He testified:

"Q Could you yourself impose the death penalty where you did not see it happen on another human being, or even consider its imposition?

"A No, sir, I couldn't."

In view of the definite statement of the prospective juror, reversible error is not shown. See *Witherspoon, supra; White v. State,* Tex.Cr.App., 543 S.W.2d 104.

■ During the voir dire of panel member Southern, the options of punishment in the event of a conviction of capital murder were explained to him and the following testimony was given:

" . . .. Let me ask you this legal question: That this mandatory penalty of death or imprisonment for life, will this affect your deliberations on an issue of fact if you knew that the answer to the issues would determine whether he got life or death?

"Yea, it would."

Reversible error is not presented in the court's sustaining the State's challenge for cause. V.T.C.A. Penal Code, Sec. 12.31(b); [2] *Moore v. State,* Tex.Cr.App., 542 S.W.2d 664; *White v. State, supra; Boulware v. State,* Tex.Cr.App., 542 S.W.2d 677, *Shippy v. State,* Tex.Cr.App., 556 S.W.2d 246 (1977); *Woodkins v. State,* Tex.Cr.App., 542 S.W.2d 855.

■ Prospective juror Crouch testified on voir dire that as a juror he could not consider voting for the death penalty under any circumstances. He also stated under oath that the knowledge that a defendant

is mandatory on conviction of a capital felony. A prospective juror shall be disqualified from serving as a juror unless he states under oath that the mandatory penalty of death or imprisonment for life will not affect his deliberations on any issue of fact."

would receive the death penalty if the special issues submitted were answered in a particular manner would affect his answers to the fact issues. The court properly excused Crouch. *Witherspoon v. Illinois, supra.* V.T.C.A. Penal Code, Sec. 12.31(b); *Moore v. State, supra; White v. State, supra; Boulware v. State, supra, Shippy v. State, supra; Burns v. State,* Tex.Cr.App., 556 S.W.2d 270 (1977).

■ Panel member Shely did not believe that he could inflict the death penalty. In addition, like Crouch and Southern, he also disqualified as a juror under the requirements of Section 12.31(b), supra, stating that the fact that death would be imposed if certain answers were given to special questions would affect his deliberations on fact issues. Shely was properly excused by the court on the State's challenge for cause.

■ After the State explained to panel member Castillo that in the event of a conviction at the guilt stage for capital punishment special issues would be submitted to the jury requiring fact findings, and their answers would determine whether the punishment would be life sentence or death, the following questions were asked and answers given:

"Now, knowing this to be true, would your knowledge that the way you answer questions the man would receive death in the electric chair; would that influence your—the way you answer the questions, in other words?

"A Yes, I will repeat again, I mean, no life should be taken by others.

"Q All right, and as I understand you, Mr. Castillo, is under no circumstances or no conditions would you yourself, that is, Raymond Castillo, do anything to inflict the death penalty, is that correct?

"Juror shakes head.

"Q You would not?

"A I would not."

The court properly sustained the State's challenge for cause to Castillo. *White v. State, supra.*

Grounds 2–6 inclusive are overruled.

■ Appellant, in his 19th ground, complains of the trial court's "unduly restricting the defense voir dire" of prospective jurors Marsh, Lott, Thompson, Brown, and McCarthy. He contends reversible error was committed when the court sustained the State's objections to questions propounded to these prospective jurors concerning their possible prejudice toward appellant at the time they first heard or read of the killings of Officer Garza and his wife.

Each of the jurors named in appellant's multifarious ground of error was thoroughly questioned by State and defense counsel as to what they had heard, read, or discussed about the case, and as to any opinions they may have formed concerning appellant's guilt or innocence. Each testified he or she had no opinion which would influence his verdict. Defense counsel was permitted to inquire of all jurors, including those named in this ground of error, whether he "has a prejudice or any feeling against" appellant, and each answered in the negative. See Art. 35.16(a)(8), V.A.C. C.P., supra. The questions to which objections were sustained were not disqualifying under said article. There were no restrictions placed on counsel on questions concerning present feelings of the jurors, such as bias in favor of or prejudice against appellant. None of these jurors knew appellant. The questions asked and objected to, in the context in which they were asked, pertained to the offense and not personally to appellant.

This Court has consistently held that the constitutional guarantee of the right to be represented by counsel carries with it the right of counsel to interrogate prospective jurors in such a manner as to enable the intelligent exercise of peremptory challenges. *Abron v. State,* Tex.Cr.App., 523 S.W.2d 405; *Hernandez v. State,* Tex.Cr.App., 508 S.W.2d 853; *Burkett v. State,* Tex.Cr.App., 516 S.W.2d 147; *Mathis v. State,* 167 Tex.Cr.R. 627, 322 S.W.2d 629; *Livingston v. State,* 152 Tex.Cr.R. 302, 214

S.W.2d 119. After a review of the entire voir dire of the five jurors named in this ground of error, and noting the latitude given by the court to the parties in their interrogation, and the extensive questioning of the panel members, we find the comments in our opinion in *Burkett, supra,* concerning our opinion in *Grizzell v. State* applicable in the instant case. We quote from *Burkett* as follows:

" . . .. Although *Grizzell v. State,* 164 Tex.Cr.R. 362, 298 S.W.2d 816, did not involve the denial of a question sought expressly for the exercise of a peremptory challenge, we find the test stated there to be appropriate for this situation, in light of the latitude which should be accorded counsel in preparing himself to intelligently exercise his client's peremptory challenges. In *Grizzell v. State, supra,* on motion for rehearing, at 821, Judge Morrison, speaking for a unanimous court, gave guidance on the issue before us in the following manner:

"After setting out the questions which the defendant had sought to ask, and then setting out the trial court's qualification of the bills of exception, which qualifications showed other questions which were asked, it was stated:

" 'As we view the questions [sought], they were no more than a restatement of what the court's qualification shows was actually asked.

" 'The trial court must be allowed some discretion in limiting the examination of prospective jurors or some trials would never terminate. We remain convinced that the appellant has failed to show that he has been deprived of any valuable right by the limitation herein assigned as error.' *Grizzell v. State, supra,* at 822."

The nineteenth ground of error is overruled.

■ In grounds of error 20–24 and 33–38, appellant complains of the trial court's refusal to delete from appellant's written confession certain "immaterial, prejudicial and unrelated statements therein," contending such statements showed the commission by appellant of inadmissible extraneous offenses.

As heretofore stated in our summary of the evidence, supra, the record reflects that the killing of deceased and his wife occurred while appellant was en route to Cotulla to commit, with confederates, a robbery at a bank. In his confession, he stated that a few days before the killing he stole a car in Atlanta, Georgia, and drove it to Little Rock, Arkansas. There he was met by an ex-convict friend of his, and he, together with this friend and another, conspired to commit this robbery in Cotulla. The three drove in the stolen car to Dallas and then to San Antonio, where plans for the robbery, including the securing of weapons, were completed. Appellant went to Cotulla to "check out the bank" and went back to San Antonio to report to his confederates. They then left for Cotulla, he in a rented car, and one of his friends in the car stolen in Atlanta. Appellant stopped en route to buy some articles to use in connection with the robbery. It was while he was on his way to Cotulla to join his fellow conspirators in the robbery that he was arrested by deceased, resulting in the killing here involved.

The theft of the car in Atlanta, and the conspiracy to rob formed by appellant and his co-conspirators, and the acts committed by appellant with his confederates in their conspiracy, were closely interwoven with the instant offense and were all links in the chain of events leading to the murder of deceased, and reflected the context in which the crime occurred. See *Query v. State,* Tex.Cr.App., 485 S.W.2d 924; *Tinsley v. State,* Tex.Cr.App., 461 S.W.2d 605; *Sustaita v. State,* Tex.Cr.App., 396 S.W.2d 381. The court did not err in refusing to delete from the confession the statements referring to appellant's preparations to commit the robbery at the bank in Cotulla. Grounds of error 20–24 inclusive and 33–38 inclusive are overruled.

■ In grounds 39–50 inclusive, appellant complains of the court's refusal to delete from his confession all references to

deceased's wife and his shooting her, since they reflect an inadmissible and prejudicial extraneous offense for which he was not on trial. The record reflects, and appellant confessed, that deceased Luis Garza and his wife Elida Garza were both kidnapped and killed by appellant in the same continuing episode and all that occurred in connection with the kidnapping and shooting, including the abduction and shooting of Elida Garza, was res gestae of the offense of murder of Luis Garza and was properly admitted in evidence. As stated in *Johnson v. State,* Tex.Cr.App., 510 S.W.2d 944, quoted with approval and followed in *Thomas v. State,* Tex.Cr.App., 530 S.W.2d 834, 837:

"It is well settled that '[w]here the offense is one continuous transaction, or another offense is a part of the case on trial or blended or closely interwoven therewith, proof of all the facts is proper.'" Citing authorities.

See also *Woodard v. State,* Tex.Cr.App., 470 S.W.2d 650; *Taylor v. State,* Tex.Cr.App., 420 S.W.2d 601; *Williams v. State,* Tex.Cr.App., 500 S.W.2d 163; *Joshlin v. State,* Tex.Cr.App., 488 S.W.2d 773.

The court did not err in refusing to delete statements in appellant's confession relating to the abduction and killing of Officer Luis Garza's wife, Elida Garza. Grounds of error 39–50 inclusive are overruled.

In his 28th ground, appellant contends the court erred in admitting in evidence his written confession "when the involuntary character of the statement was established by the evidence."

A pre-trial hearing on appellant's motion was conducted by the court, and after hearing evidence, the court filed full findings supporting its conclusion, beyond a reasonable doubt, that appellant voluntarily made and signed the confession after being thoroughly advised of his constitutional and statutory rights, and after having knowingly, intelligently, and voluntarily waived such rights, and that no force, threats, or coercion was used and no promises made in securing the confession.

The record reflects that appellant was arrested about 2:10 p.m. on the day of the offense, July 19, while driving a car in Medina County. Immediately after his arrest, his "rights" were read to him from the officer's blue card by Officer Scott, and appellant stated "I don't want a lawyer, want to tell you all about it." He was taken to the city hall in Devine, where Justice of the Peace Parma explained to the appellant his rights as provided in Art. 15.-17, V.A.C.C.P.[3] Appellant again stated he did not want a lawyer and wanted to tell "all about it." District Attorney Brite was notified of appellant's arrest, and he arrived

---

**3.** The warning read to appellant, and signed by Judge Parma as magistrate and by appellant, is as follows:

"Q All right, and what—what did you read to him, Judge?

"A The State of Texas, County of Medina. Before me, the undersigned magistrate of Medina County, Texas, on the 19th day of July, A.D., 1973, at three o'clock P.M. at Devine, Texas, in the City of Devine, Texas, appeared Leonard Wilson Freeman in the custody of Sheriff Tommy Williams of Atascosa County at which time I informed the said Leonard Wilson Freeman of the accusation or accusations against him, two, of any affidavit or affidavits, if any, filed against him in support of such accusation or accusations, three, of his right to retain counsel, four, of his right to remain silent, five, of his right to have an attorney present during any interview with peace officers or attorneys representing the State, six, of his right to terminate the interview at any time, seven, of his right to request the appointment of counsel if he was an indigent and cannot afford counsel, that is, if he was too poor to hire a lawyer, eight, of his right to have an examining trial, nine, that he did not have to make a statement and that any statement made by him may be used against him, and ten, that he would be allowed a reasonable time and opportunity to consult counsel, and eleven, that he would be permitted to make bail, if allowed by law.

"I explained each of these numbered sentences by sentence, individually, and asked him if he waived or understood them and he understood them and waived each one and signed down below, John V. Parma, Magistrate, JP Precinct 8, Medina County, and warning was received, Leonard W. Freeman.

"Q Is that the defendant's signature at the bottom?

"A Yes, sir."

in Devine shortly after Justice of the Peace Parma had explained the rights of counsel and of silence to appellant.

District Attorney Brite testified that shortly after he arrived at the city hall in Devine he asked appellant if he wanted to make a statement and he answered: "Yes I would. I will tell you all about it." Brite testified further:

"Q Now, before you took that statement, the actual facts set out in the statement, did you give the defendant the so-called Miranda warnings?

"A Yes, I took this very form itself and he set down at the table with me and I would like to relate exactly what I told him which is verbatim as in the statement. In fact, I took each sentence that's in the statement and told him and if he had any question, which he had very few, but explained it to him.

"Q Just tell the Court the warning.

"A All right, as shown in State's Exhibit Number Two, I told him that he was charged with murder with malice. Complaints, if they had not been filed, would be filed immediately against him for murder with malice aforethought; that he had the right to have a lawyer—let me—let me say this in order to make this clear. In other words, I asked him if he had been warned by Judge Parma and which I had been given this, and he said that—

"Q Talking about—when you say this, you are talking about State's Exhibit Number One?

"A State's Exhibit Number One, that's correct.

"Q All right.

"A And the statement form states that he received from the Magistrate John V. Parma, three o'clock P.M. on the 19th of July, 1973, and that Judge Parma or the Magistrate told me and I received and understood the following warning and information: . . . ."

Then follows the warning substantially as testified by Judge Parma, supra (See footnote 3). Brite then testified:

"He stated that Judge Parma had given him this warning and he didn't want a lawyer. He did not want an examining trial, and I went over each sentence that follows in the statement form.

\*　　\*　　\*　　\*　　\*　　\*

"And after he had been warned and the warning as stated in the statement, we went over it sentence by sentence. After he was warned and the warning fully explained to him by me, the person to whom the statement was made, he stated he fully understood the same and he told me as he did Judge Parma specifically that he wanted to make the statement. He did not want a lawyer to help him and he waived all his other rights and privileges explained to him by Judge Parma and by myself."

Brite told how appellant then talked freely and at length, and that he (Brite) took notes, later typing them just as appellant had stated the facts. The statement as typed was handed to appellant who "took his time; he read each page; he made one or two minor corrections and he stated that the statement was correct as he had told me and he wanted to sign it . . . I asked him to sign each page so he would know each page that he had read before he signed it. I asked him again if he fully understood the warning previously given him and he stated that he did and wanted to sign the statement."

Brite also testified no promises were made appellant and no force, threats, or violence of any kind was used on him.

Defense counsel did not cross-examine witness Brite at the hearing and offered no rebutting testimony.

District Attorney Brite and Justice of the Peace Parma testified at the trial before the jury substantially as they did at the pre-trial hearing.

The record fully supports the trial court's findings that the appellant, having been fully advised of his Miranda, Art. 38.22,

V.A.C.C.P., and Art. 15.17, V.A.C.C.P. rights, knowingly, intelligently and voluntarily waived these rights. The court did not err in holding the confession admissible in evidence. *McKittrick v. State,* Tex.Cr. App., 541 S.W.2d 177; *Brantley v. State,* Tex.Cr.App., 522 S.W.2d 519; *Horne v. State,* Tex.Cr.App., 506 S.W.2d 596; *Simmons v. State,* 504 S.W.2d 465.

Appellant contends "that there can be no intelligent and competent waiver of these rights when a defendant is confessing to a capital case without knowing that his life is at stake" and that the warning was insufficient in that he was not notified that a punishment for murder of a peace officer in the performance of his duty is death. As a matter of fact, the officer had not died when the warnings were first given. District Attorney Brite testified before the jury on the trial that when he first gave the warning Luis Garza had not yet died and he told appellant he was accused of murder of Elida Garza and assault to murder of a peace officer "and during the time of taking the written statement, why, we received word that Mr. Garza had died and he was immediately told, and before he ever signed the statement, but I did explain to him the nature of the charges that would be pending against him at that time . . ."

In *Sanchez v. State,* 454 S.W.2d 210, where the death penalty was assessed, this Court expressly held that the failure to warn the defendant that death could be a possible punishment for his offense did not render the confession inadmissible. See also *Babcock v. State,* Tex.Cr.App., 473 S.W.2d 941; *Elliott v. State,* Tex.Cr.App., 444 S.W.2d 914.

The 28th ground of error is overruled.

■ In ground 25, appellant challenges this Court's opinion in *Jurek v. State,* 522 S.W.2d 934, holding Texas statutes authorizing the death penalty in certain murder cases to be constitutionally valid. He contends such statutes to be violative of the 8th and 14th Amendments of the United States Constitution. Since appellant's brief was prepared and filed the constitutionality

and validity of these Texas statutes, effective June 14, 1973, has been definitely settled adversely to appellant's contentions. See *Jurek v. Texas,* 428 U.S. 262, 96 S.Ct. 2950, 49 L.Ed.2d 929; *Gregg v. Georgia,* 428 U.S. 153, 96 S.Ct. 2909, 49 L.Ed.2d 859; *Proffitt v. Florida,* 428 U.S. 242, 96 S.Ct. 2950, 49 L.Ed.2d 913. See also *Smith v. State,* Tex.Cr.App., 540 S.W.2d 693; *White v. State,* 543 S.W.2d 104; *Gholson v. State,* Tex.Cr.App., 542 S.W.2d 395; *Collins v. State,* 548 S.W.2d 368. The 25th ground of error is overruled.

■ Appellant contends in ground 26 that the court reversibly erred in refusing to provide him with sufficient funds for investigative expenses and expert testimony.

The record reflects that at appellant's request the court at a pre-trial hearing February 1, 1974, appointed Charles Stefano as defense investigator, authorizing a fee of $250.00. Thereafter, on March 1, at a pre-trial hearing the court authorized an additional $250.00 to complete "the maximum amount allowable." Appellant excepted to the refusal to allow more expense money as follows:

"MR. STRAUSS; Your Honor, I would just like to make the record clear, if I haven't already, that we strongly object and except to the Court's ruling on our Motion for additional investigative expenses. We feel that there are four indictments and we are required at least the minimum statutory fee on each of these and that this—notwithstanding the fact of what the statute says, I think of a capital case of this proportion that the constitutional right of counsel even supersedes the limitation placed in the statute itself and without these additional investigative expenses, this constitutional right of counsel, effective assistance of counsel cannot be met in order to receive a fair trial as guaranteed by the Fourteenth Amendment to the Constitution of the United States, and we strongly object and except to the Court's ruling on this Order."

As stated by this Court in *Cherry v. State*, 488 S.W.2d 744, on p. 753:

"The appellant acknowledges that the maximum sum for investigatory fees permitted by law under the provisions of Article 26.05, Sec. 1(d), V.A.C.C.P.,[3] was provided and expended in his behalf. The appellant then asserts that 'The record in this case adequately shows the need for funds in excess of $250.00 provided for by law for expert witness and investigation costs (As recognized by the trial court), and that the denial of the right to such money constitutes a deprivation of the right to an effective presentation of all defensive issues available to the accused.' The appellant's brief makes the above conclusion and does not refer to any portions of this voluminous record showing how the appellant was harmed and we have been unable to find any part of the record showing harm to the appellant.[4]"

Footnotes 3 and 4 of *Cherry* read:

"3. Article 26.05, Sec. 1(d), V.A.C.C.P., has since been amended to provide: 'For expenses incurred for purposes of investigation and expert testimony, a reasonable fee to be set by the court but in no event to exceed $500;'

"4. Appellant's only references are to those parts of the record where the requests for additional funds are reflected."

The four indictments referred to by appellant all are for offenses arising on the same day out of the same criminal episode, and the physical location of each was in Atascosa County.

They were for the murder of Luis Garza (the instant case), the murder of Elida Garza, the burglary of the home to which appellant went immediately following the killings, and the theft of the car taken at this home. (See summary of evidence, supra). Investigation of the instant case necessarily included investigation of the incidents of the other three. As in *Cherry*, supra, the

record fails to show harm in the refusal of the court to authorize more expense money than allowed for one case by Art. 26.05, Sec. 1(d), V.A.C.C.P. See also *Henriksen v. State*, Tex.Cr.App., 500 S.W.2d 491; *Shelton v. State*, Tex.Cr.App., 462 S.W.2d 285; *Chamberlain v. State*, Tex.Cr.App., 453 S.W.2d 490; *Eggleston v. State*, Tex.Cr.App., 422 S.W.2d 460. The 26th ground of error is overruled.

 In his 27th ground, appellant complains of the court's refusal to strike the State's controverting affidavit to the motion for a change of venue. The motion to strike was based on the fact that the State's controverting affidavit was signed and sworn to by the district attorney and the county attorney who prosecuted this case.

The hearing on the motion for a change of venue and the State's controverting affidavit began February 28, 1974. Both sides announced ready. After 20 witnesses had testified, the appellant filed and presented his motion to strike the State's controverting affidavit. The motion to strike was overruled, and the hearing continued. Under the circumstances, the motion to strike was filed and presented to the court too late to preserve error, if any, and the alleged defects in the State's controverting affidavit were waived. *Puryear v. State*, Tex.Cr.App., 510 S.W.2d 356; *Lewis v. State*, Tex.Cr.App., 505 S.W.2d 603; *Ward v. State*, Tex.Cr.App., 427 S.W.2d 876.[4]

 Appellant next, in ground 29, contends that because deceased Luis Garza had not properly subscribed to the oath of a deputy sheriff he had not qualified as such officer and the court erred in failing to so instruct the jury.

Appellant was convicted of capital murder under that portion of the death penalty statute which provides that the murder of a peace officer in the lawful discharge of an official duty and who the accused knows is a peace officer constitutes capital murder. Art. 2.12, V.A.C.C.P., provides in part that a sheriff and his deputies are peace officers.

4. In view of our disposition of this ground, we do not pass on appellant's contention that the prosecuting attorneys did not qualify as compurgators under Art. 31.04, V.A.C.C.P.

Art. 6869, V.A.T.Civ.St., provides in part that a person appointed as a deputy sheriff "shall, before he enters into the duties of his office, take and subscribe to the official oath."

The record reflects that Garza was named as deputy sheriff of Atascosa County and his appointment was approved by the Commissioners' Court effective February 15, 1973. His official bond executed by him and a surety company was filed in the county clerk's office February 16. He signed an oath of office on February 15; however, the oath he signed on the bond form was the prescribed oath for a county judge and county commissioner. Nevertheless, this oath contained all the requirements of a sheriff's and deputy sheriff's oath, with certain additional provisions. The defect in the oath was that it was not sworn to and subscribed before a notary public or other person authorized to take an oath. It was stamped with the seal of the County Court of Atascosa County, Texas.

The sheriff of Atascosa County testified that deceased worked for him as an active deputy sheriff from February 15, 1973 until the day he died on July 19. Deceased was placed on the county payroll as deputy sheriff on February 15 and was issued a Certificate of Deputation by the county clerk on that same day. The record establishes that he served actively as a full time deputy sheriff from February 15, 1973 until the day of his death July 19, 1973, and was generally recognized in the county as a deputy sheriff. Under the circumstances we conclude that deceased as a de facto deputy sheriff was a peace officer as that term is used in the section of the capital murder statute under which appellant was convicted and that the court did not err in failing to instruct the jury to the contrary. See 47 Tex.Jur.2d, p. 316, Public Officers, Sec. 257; *Burkhardt v. State,* 83 Tex.Cr.R. 228, 202 S.W. 513; *Ex parte Grundy,* 110 Tex.Cr.R. 367, 8 S.W.2d 677. See also *Ex parte Le Fors,* 171 Tex.Cr.R. 229, 347 S.W.2d 254; *Broach v. Garth,* Tex.Civ.App., 50 S.W. 594 (n.w.h.) Ground of error 29 is overruled.

In ground 30, appellant complains of the added written instruction of the court to the jury, after argument at the punishment stage, that the jury should not consider "any possible action of the Board of Pardons or the Governor nor how long this defendant will be required to serve on a sentence of life imprisonment."

After the jury had found appellant guilty of capital murder, the court conducted the punishment phase of the trial. The original draft of the charge at that part of the trial contained instructions to the effect that the jury should not consider the length of time appellant would be required to serve on a life sentence. When appellant objected, this paragraph was deleted prior to the charge being read to the jury. During argument, both defense counsel told the jury and argued to the effect that if given a life term appellant would be required to spend the rest of his life in prison. In view of such arguments, the court, over written objection of appellant, gave an additional written instruction to the jury that it should not consider any possible action of the Board of Pardons or the Governor, nor how long appellant will be required to serve on a sentence of life imprisonment. The giving of this admonitory instruction in order to guard against jury misconduct is largely left to the court's discretion, and is not error. *Williams v. State,* Tex.Cr.App., 511 S.W.2d 64; *Harris v. State,* Tex.Cr. App., 457 S.W.2d 903; *Hernandez v. State,* 169 Tex.Cr.R. 418, 334 S.W.2d 299. See also *Speights v. State,* Tex.Cr.App., 499 S.W.2d 119.

In the instant case, in view of the improper arguments of defense counsel discussing the length of time appellant would be imprisoned on a life sentence, the trial court did not abuse its discretion in giving this additional written instruction after oral argument had commenced.

Appellant next contends in ground 31 the court reversibly erred in trying appellant while he was handcuffed and in shackles in the presence of the jury.

A hearing was conducted by the court in the absence of the jury on the State's contention of a necessity that appellant be tried while handcuffed and shackled for security reasons. Sheriff Williams testified in part as follows:

"Q Mr. Williams, since July 19th, 1973, have you had custody of the defendant, Leonard Wilson Freeman?

"A Yes, we have.

"Q And let me ask you this. Sheriff Williams, has the defendant, Leonard Wilson Freeman ever made threats to you what he was going to do in the court room during the progress of this trial?

"A Yes, he has.

"Q Prior to the trial today, has he made threats to you or against other officers of physical violence that he would take if he got the chance?

"A Yes, he has.

"Q Would you relate now—prior to today, would you relate the nature of what the defendant related to you?

"A On a number of occasions he has said that before that we ever got to see him die in Huntsville, that he would take three or four of us with him. He has made this remark on numerous occasions.

"Q And now did you bring him from San Antonio this morning?

"A Yes, sir, yes, we did.

"Q To the Court House? Did he make any remarks regarding—this morning, regarding his conduct during the trial?

"A He said that we better keep a very close eye on him because that he liked action and that before it was over, there would be action in the Courtroom.

"Q And—

"A This remark was made this morning enroute to here.

"Q You have talked to him numerous times from July 19th until the present date?

"A Many times.

"Q And based upon what he has threatened to do, is it your opinion that he should remain handcuffed during the trial of this case?

"A Yes, I definitely think so.

"Q For his own safety and the safety of other people?

"A Yes.

"Q That's your recommendation to the Court?

"A Yes, it is."

On cross-examination by defense counsel, the sheriff testified:

"Q Can you envision any possibility of him acquiring any means of doing harm to someone?

"A We are going to try to see that he doesn't, but there's always a chance, if he is uncuffed, that he could possibly get an officer's revolver and there may be somebody killed if he does."

No other evidence was offered by either party. The court ruling was as follows:

"THE COURT: On the basis of the presentation made, the Court will overrule the Motion. The Court finds that there is ample basis or basis upon the testimony of the Sheriff which stands undenied that the security of the Court and officers require that he placed as he is with the cuffs during the remainder of the trial. I will state this, however, that as far as humanly possible, the Court will not—the Court will ask that the defendant be brought in before the jury is brought in and seated as he was this morning before the—and during the remainder of the trial be—I'm not suggesting that this is the only route, but I believe there is a route through the Clerk's office and into the hallway without going through the crowd close to the stairway, in other words, as much as possible keep him from—all right.

"MR. FRANKLIN: We except to the ruling of the Court."

In *Thompson v. State*, 514 S.W.2d 275, this Court upheld a trial court's order permitting the trial of the defendant while handcuffed for security reasons. We said:

**306**

"[6, 7] It is within the discretion of the trial judge to require uniforms and handcuffs for a defendant. See *Ex parte Slaton,* Tex.Cr.App., 484 S.W.2d 102 (1972); *Hernandez v. Beto, supra,* [443 F.2d 634 (5th Cir.)] and *Kennedy v. Cardwell,* 487 F.2d 101 (6th Cir. 1973). We hold that it is within his discretion to require that witnesses be dressed in uniforms and be shackled, if the circumstances so warrant.

"[8] The test on appeal is whether the trial court abused its discretion in requiring the witnesses to appear in jail uniforms and in handcuffs. To enable this Court to review the trial court's action on appeal, the record should contain the factual matters on which the trial court's discretion was based. It must appear in the record that in exercise of its discretion the trial court had a fair knowledge and understanding of all such factual matters. See 56 Tex.Jur.2d, Trial, Section 59, and *Kennedy v. Cardwell, supra.*

"[9] In a case where a defendant was tried in handcuffs, this Court wrote that if for security reasons handcuffs are necessary the trial judge should have the record clearly reflect the reasons therefor. That record must affirmatively reflect those reasons, not in general terms but with particularity. See *Romero v. State,* Tex.Cr.App., 493 S.W.2d 206 (1974). *Walthall v. State,* Tex.Cr.App., 505 S.W.2d 898 (1974). The trial judge should give his reasons where objections are made to a witness testifying for a defendant in jail clothing or in handcuffs and instruct the jury to not consider the restraint in assessing the proof and determining guilt. See the Commentary in American Bar Association Standards, supra.

"[10] Here, the judge listed in detail his reasons for requiring the witnesses in question to appear in handcuffs and uniforms. It appears that he felt it necessary to take these precautions to preserve order in the courtroom. All of the witnesses in question were in tank 6MM2 at the time of the attempted escape and three of them had apparently been charged with the attempted escape. We

cannot say that he abused his discretion under the circumstances presented."

Under the circumstances of the instant case, and considering also the nature of the case and appellant's prior escape from custody, we conclude that the trial court did not abuse its discretion in entering the above order and in trying appellant while shackled. 56 Tex.Jur.2d, Trial, Sec. 64, p. 400; *Thompson v. State, supra; Ex parte Slaton, supra; Romero v. State, supra,* at p. 214; *Mouton v. State,* 155 Tex.Cr.R. 450, 235 S.W.2d 645. See also *Walthall v. State, supra,* footnote, p. 899; *Illinois v. Allen,* 397 U.S. 337, 90 S.Ct. 1057, 25 L.Ed.2d 353.

In his 32nd ground, appellant argues that it was error for the court to overrule his motion that the trial jury be sequestered. This was a matter within the sound discretion of the trial court. Art. 35.23, V.A.C.C.P.; *Brantley v. State,* Tex. Cr.App., 522 S.W.2d 519; *Creel v. State,* Tex.Cr.App., 493 S.W.2d 814; *Sierra v. State,* Tex.Cr.App., 476 S.W.2d 285. The record reflects that the court frequently admonished the jurors that they must not talk with anyone concerning the trial or read or listen to any of the new media about the case. No showing of any violation of these instructions appears in the record. No abuse of discretion is presented.

Appellant in ground 51 complains of the overruling of his motion for continuance of the pre-trial *Jackson v. Denno* hearing on March 1, 1974. The record reflects that one of appellant's trial counsel was appointed September 24, 1973, and the other on October 5, 1973. They were furnished copies of appellant's confession when they were appointed. Various pre-trial hearings were conducted with counsel present between December 7, 1973 and March 1, 1974. At a hearing on February 1, 1974, by agreement of counsel a pre-trial hearing was set for February 28 on all motions filed expressly including the Jackson-Denno hearing. The hearing on the motion for a change in venue was conducted on February 28. On March 1, the *Jackson v. Denno* hearing on the confession was

begun. Appellant filed and presented his motion for continuance on that day, based on his alleged need for more time to secure psychiatric evaluation of appellant's mental capacity to give a statement and more time to prepare for the hearing. The motion was based strictly on equitable and not on statutory grounds. See Arts. 29.01–29.06 inclusive, V.A.C.C.P. It is well established that the disposition of a motion for continuance based on equitable grounds lies in the sound discretion of the trial court. *Chance v. State*, Tex.Cr.App., 528 S.W.2d 605; *Ward v. State*, Tex.Cr.App., 520 S.W.2d 395; *Hernandez v. State*, Tex.Cr.App., 492 S.W.2d 466. No abuse of the court's discretion appears. The 51st ground of error is overruled.

In his next ground, appellant complains of the overruling of his subsequent motion for continuance filed April 22nd, 1974, which was the date the trial began. The basis of this motion was that (1) since the motion for a change of venue had been had and overruled seven weeks earlier, the trial should be continued until such time as prejudice against appellant no longer existed in the county, and (2) appellant had not been allowed sufficient money for investigative purposes and counsel had not had time to properly investigate the case.

 The record reflects that the case was originally set to be tried April 1 and that at a pre-trial hearing on March 28 appellant's first motion for a continuance was granted, and the trial was reset for April 22nd at 10:00 a.m. The disposition of a subsequent motion for continuance not based on a ground set forth in Art. 29.07, V.A.C.C.P., is within the sound discretion of the trial court. *Hafti v. State*, Tex.Cr.App., 487 S.W.2d 745. No abuse of discretion in overruling the second motion based strictly on equitable grounds is shown.

 The 53rd ground is based on alleged reversible error in the court's overruling appellant's motion to quash the first jury panel. In the 54th ground appellant contends the court reversibly erred in refusing to grant his motion for a new trial based on jury misconduct.

During the voir dire of panel member Burkett, he testified that one of the prospective jurors had stated in the room where they were waiting to be examined: "Somebody ought to—we can get this thing over right away, get a rope." The matter was not developed further on Burkett's voir dire and, because his subsequent answers reflected that he had a disqualifying opinion, he was excused for cause. Later, after several other prospective jurors had been examined, none of whom testified concerning the above remark, appellant filed a motion to quash the jury panel because of the above "highly prejudicial" statement made in the presence of the panel members. This motion was brought to the court's attention and, after an unreported conference at the bench, no testimony was offered and the motion was overruled.

Burkett was called as a witness about the matter at the hearing on the motion for a new trial. He testified that "a Mr. Wiley, one of the jurors called," made the statement to which Burkett had testified on voir dire. The room was full of panel members waiting to be called, and the statement was made so that Burkett felt others could have heard it. He testified:

"Q And in other words, he wasn't making a speech to everybody?

"A No, he wasn't making a speech to everybody. He was making a remark to somebody right there and it was a loud remark and I heard it about three rows back.

"Q About three rows back?

"A Yes, sir.

"Q All right. Now, whether or not people in between you and Mr. Wiley heard it or not, do you know whether they heard it?

"A No, sir, I don't.

"Q You do not?

"A No, sir.

"Q Now, as far as actually besides yourself, did anyone ever tell you that they heard it or—

"A No, sir.

"Q Other than yourself?

"A No, sir.

"Q And do you know of your own knowledge—I'm talking of your own knowledge, whether anybody heard it other than yourself?

"A No, sir.

 * * * * * *

"Q Now, you did not serve on the jury panel that tried the defendant, is that correct?

"A No, sir.

"Q And do you know of your own knowledge, Mr. Burkett, anyone that possibly heard that remark that did serve on the jury panel?

"A No, sir."

No other witness was called to testify at the hearing, and no further evidence was offered. Wiley did not serve on the trial jury, having been excused for cause.

In *Johnson v. State*, 151 Tex.Cr.R. 110, 205 S.W.2d 773, appellant in the trial court had requested that the jury panel be discharged because of an alleged prejudicial remark. The refusal of the court to do so was upheld by this Court. We quote as follows from the Court's opinion:

"It occurs to us that there is no error shown by the court's ruling because, (a) it is not made to appear that any of the other members of the jury panel heard the remark, (b) that if they did hear it, they were influenced thereby to the prejudice of appellant, (c) that the juror in question nor any other juror who may have had a similar opinion was forced upon appellant. In the absence of which no injury to him is shown."

In the absence of any evidence that any of the trial jurors heard or could have been influenced by the remark complained of, and since both Burkett and Wiley were excused for cause, no prejudice to appellant is shown. Grounds of error 53 and 54 are overruled.

■ Appellant next complains of the admission in evidence of the examining doctor's testimony concerning the autopsy performed on Elida Garza. His objection was that such testimony had "no relevancy on any issue at trial and would only serve to prejudice the jury." This evidence was blended and closely interwoven with the evidence admitted to show the death of Luis Garza, deceased in the instant case, and was properly admitted. See *Self v. State*, Tex.Cr.App., 513 S.W.2d 832 at p. 838. The nature and extent of the injuries to Elida Garza were part of the transaction and were admissible as res gestae. *Davidson v. State*, Tex.Cr.App., 386 S.W.2d 144; *Root v. State*, 169 Tex.Cr.R. 382, 334 S.W.2d 154.

■ In his final ground appellant complains of the inadequacy of the compensation allowed by the court as attorneys' fees under the provisions of Art. 26.05, V.A.C.C.P. No harm to appellant resulting from the compensation allowed by the court is either alleged by counsel or shown in the record. Under the circumstances, this is not a matter of which the Court of Criminal Appeals will or should take jurisdiction.

Finding no reversible error, the judgment is affirmed.

Opinion approved by the Court.

ROBERTS, Judge, dissenting.

For the reasons stated in Part I of my dissenting opinion in *Shippy v. State*, Tex. Cr.App. 556 S.W.2d 246 (delivered April 27, 1977), I dissent to the majority's disposition of appellant's ground of error complaining of the erroneous exclusion of prospective juror Southern. Such action violated the mandate of *Witherspoon v. Illinois*, 391 U.S. 510, 88 S.Ct. 1770, 20 L.Ed.2d 776 (1968).

PHILLIPS, J., joins in this dissent.